# EXHIBIT A

**Court of Common Pleas, Fairfield County, Lancaster, Ohio**
# SUMMONS
Rule 4 1970 Ohio Rules of Civil Procedure
**Case No. 2022 CV 00447**
**JUDGE DAVID A TRIMMER**

**PICKERINGTON RETAIL VENTURES LTD**
**DBA SHOPPES AT HUNTERS RUN**

**C/O PLAZA PROPERTIES INC AGENT**
**3016 MARYLAND AVENUE**
**COLUMBUS OH 43209**

**Plaintiff**
**vs.**

**7-ELEVEN INC**

**3200 HACKBERRY ROAD**
**IRVING TX 75063**

**Defendant**

To the above-named defendant;

You are hereby summoned that a complaint (a copy of which is hereto attached and made a part hereof) has been filed against you in this court by the plaintiff named herein.

You are required to serve upon the plaintiff attorney, or upon the plaintiff if he has no attorney of record, a copy of your answer to the complaint within 28 days after service of this summons upon you, exclusive of the day of service. Said answer must be filed with this court within three days after service on Plaintiff's attorney is as follows:

**MICHAEL J CASSONE**
**5086 NORTH HIGH STREET**
**COLUMBUS, OH 43214**

If you fail to appear and defend, judgment by default will be taken against you for the relief demanded in the complaint.

Branden C. Meyer, Clerk

By *Richauna Jones*
Deputy

RECEIVED
AUG 3 0 2022
7-ELEVEN, INC.
LAW OFFICES

## ⍓ORIGINAL

### IN THE FAIRFIELD COUNTY COURT OF COMMON PLEAS
### LANCASTER, OHIO
### CIVIL DIVISION

PICKERINGTON RETAIL VENTURES, LTD.
d.b.a. SHOPPES AT HUNTERS RUN
c/o Plaza Properties, Inc., Agent
3016 Maryland Avenue
Columbus, Ohio 43209,

                       **Plaintiff,**

vs.

7-ELEVEN, INC.
3200 Hackberry Road
Irving, Texas 75063

                       **Defendant.**

Case No. 22CV 447

JUDGE TRIMMER

FILED 2022 AUG 24 AM 9:48
BRANDEN L. MEYER
CLERK OF COURTS
FAIRFIELD CO. OHIO

### COMPLAINT

Now comes Plaintiff, Pickerington Retail Ventures, Ltd. d.b.a. Shoppes at Hunters Run (hereinafter "Plaintiff", "Lessor" or "PRV"), by and through undersigned counsel, and states as follows as its Complaint against Defendant, 7-Eleven, Inc. (hereinafter "Defendant" or "Defendant [Name]"):

1. This is an action to recover damages for breach of contract and unjust enrichment under Title 23 of the Ohio Revised Code.

### I.    JURISDICTION and VENUE

2. This Honorable Court has jurisdiction to construe written contracts, agreements and/or other documents at issue in this action under O.R.C. §§ 2305.01 et seq.

3. Venue is proper in this action pursuant to Civ.R. 3(B) because the Defendants' conduct that gave rise to Plaintiff's claim for relief was in Fairfield County, Ohio.

### II.    PARTIES

4. Plaintiff PRV is a domestic limited liability company, registered with the Ohio Secretary of State, charter/registration number 1433875, with its principal place of business in Columbus, Ohio 43220.

5. Defendant 7-Eleven, Inc., is a Texas corporation, with its principal place of business in Irving, Texas 75063.

## III. FACTS COMMON TO ALL COUNTS

6. Plaintiff hereby incorporates all allegations set forth in Paragraphs one (1) through five (5) as if fully rewritten herein.

7. On or about July 28, 2021, Defendant executed a Shopping Center Lease for the commercial premises located at 10501 Blacklick-Eastern Road, Suite 100-400, Pickerington, Ohio, as more particularly described in the Lease, which is attached hereto as Exhibit "A" and expressly incorporated herein.

8. The term of the Lease Agreement is for a period of seven (7) years from the Commencement Date, which is sixty (60) days after Plaintiff has received Defendant's written notice of satisfaction of all conditions precedent under Article 22.

9. On January 28, 2022, Defendant served Plaintiff with a Notice of Termination, a copy of which is attached hereto Exhibit "B" and expressly incorporated herein.

10. The Termination Notice fails to state specifically the reason for Defendant's election to terminate the Lease.

11. Despite the failure to state a reason for the termination, Defendant stated to Plaintiff on or about January 21, 2022, that Defendant cannot get all their permits and will therefore be terminating the Lease.

12. Defendant's reliance on their alleged inability to obtain the requisite permits is completely false, and fraudulently put forth in an attempt to bypass their responsibilities under the Lease.

13. Defendant was able to obtain the requisite permits and in fact did have them in place and/or the permits were approved and being issued by City of Pickerington.

14. Under the Lease Agreement, Defendant is obligated to pay annual rent in the amount as follows: a) years one (1) through three (3)—$76,800.00; and b) years four (4) through seven (7)—$80,640.00

15. Under the Lease Agreement, Defendants are obligated to pay the annual rent in equal monthly installments in the amount as follows: a) years one (1) through three (3)—$6,400.00; and b) four (4) through seven (7)—$6,720.00.

16. Under the Lease Agreement, Defendant is obligated to pay their portion of the common area maintenance expenses of not more than five and 57/100 dollars ($5.57) per square foot or twenty-six thousand seven hundred thirty -six and 00/100 dollars ($26,736.00).

17. Under the Lease Agreement, Defendant is obligated to remit a late fee of ten percent (10%) of the rent payment not received before the close of the sixth (6th) day of each month rent accrues.

18. As of the date of this Complaint, Defendants are in breach of the commercial lease agreement for failing to pay Plaintiff any rent and/or their portion of the common area expenses.

19. Plaintiff relied on Defendant's actions and statements to enter into the Lease.

20. To facilitate their Lease with Defendant, Plaintiff terminated and moved an existing tenant from the subject property.

21. Plaintiff's reliance on Defendant's statement and actions to enter into the Lease has not

22. As of the date of this Complaint, Defendant has not remitted payment for their portion of the rent and common area operating expenses, taxes, and/or insurance.

23. As of the date of this Complaint, Defendant has not remitted the late fee as prescribed under the Lease Agreement.

24. With each passing month, Defendant's balance with respect to rent, and common area fees will increase.

25. As of the date of this Complaint, Defendant is in default under the lease agreement.

26. Under the lease agreement, Plaintiff may accelerate the life of the lease as damages for Defendant's breach thereto.

27. Defendant, by refusal to remit payment to Plaintiff, is now in default under the terms of the lease agreement.

## IV. CAUSES OF ACTION

### COUNT ONE (1): BREACH OF CONTRACT

28. Plaintiff hereby incorporates all allegations set forth in paragraphs one (1) through twenty-seven (27) as if fully rewritten herein.

29. Defendant 7-Eleven, Inc. entered into possession of the premises pursuant to a written lease agreement. Under such lease, Defendant has the obligation to pay to Plaintiff/Lessor monthly rental payments, including their portion of the common area fees.

30. As of the date of this Complaint, Defendant is in default on the Lease Agreement for failing to make the requisite payments.

31. Pursuant to the Lease Agreement, Defendant is required to make monthly rental payments, payments for common area operating expenses and late charges to Plaintiff throughout the full term of the Lease Agreement.

32. As a direct and proximate cause of Defendant's failure to pay rent and other fees, Plaintiff has suffered actual damages in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00).

## COUNT TWO: BREACH OF DUTY OF GOOD FAITH AND FAIR DEALING

33. Plaintiff hereby incorporates all allegations set forth in Paragraphs one (1) through thirty-two (32) as if fully rewritten herein.

34. As per the lease agreement and Ohio law, Defendants owed Plaintiff a duty of good faith and fair dealing.

35. By virtue of their wrongful acts in materially breaching the lease agreement, Defendants have breached their duty of good faith and fair dealing

36. Furthermore, Defendants' conduct has been intentional, malicious, in conscious disregard of Plaintiff's rights, and purposely designed to injure Plaintiff.

37. As a direct and proximate result of Defendants' breach of their duty of good faith and fair dealing, Plaintiff has been damaged in an amount to be proven at trial in excess of Twenty-Five Thousand Dollars ($25,000.00), and is entitled to punitive and/or exemplary damages due to Defendants' malicious, intentional conduct and conscious disregard of Plaintiff's rights.

## COUNT THREE: UNJUST ENRICHMENT

38. Plaintiff hereby incorporates all allegations set forth in paragraphs one (1) through thirty-two (32) as if fully rewritten herein.

39. Plaintiff expected payment of monies pursuant to the terms of the Lease Agreement, and Defendants knew that Plaintiff expected such payments.

40. Plaintiff has suffered damages as a result of Defendant's actions.

41. Defendant received the benefit of the use of the Property.

42. Plaintiff did not receive any corresponding gain for allowing Defendant's use of the Property without payment.

43. As a direct and proximate result of this inequity, Defendant is unjustly enriched and as such, principles of equity require that this injustice be avoided and that Plaintiff be granted a remedy to make it whole.

44. As such, Defendant must compensate Plaintiff for the detriment that Plaintiff has suffered and/or the amount that Defendant has been unjustly enriched.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays this Court will grant it the following relief:

(a) Actual damages from Defendants, jointly and severally, in an amount to exceed $25,000.00;

(b) Compensatory damages from Defendants under the life of the lease term as allowed under Ohio law in an amount to exceed $25,000.00.

(c) Costs of prosecuting this action, including reasonable attorney's fees as provided for in the written lease agreement; and

(d) Any and all other relief that this Court deems just and/or appropriate from the Defendants.

DATED: 23 MARCH 2022          Respectfully submitted,

CASSONE LAW OFFICES LLC

Michael J. Cassone (0077778)
5086 North High Street
Columbus, Ohio  43214
(614) 974-2022 (phone)
mcassone@cassonelaw.com
*Counsel for Plaintiff*

# Pickerington Retail Ventures, Ltd.

## v.

## 7-Eleven, Inc.

# EXHIBIT "A"
# SHOPPING CENTER LEASE



PROPERTY # 42167

Shoppes at Hunters Run
10501 Blacklick-Eastern Road, Suites 100-400
Pickerington, Ohio

SHOPPING CENTER LEASE

1.   PARTIES. This Shopping Center Lease (this "Lease") is between Pickerington Retail Ventures, LTD, an Ohio limited liability company (the "Landlord"), and 7-Eleven, Inc., a Texas corporation (the "Tenant").

2.   PREMISES. (a) Landlord grants and leases to Tenant and Tenant takes and leases from Landlord the premises containing approximately 4,800 square feet (the "Premises") described in the attached Exhibit A and shown on the site plan (the "Site Plan") attached hereto as Exhibit B which are both a part of this Lease.   The Premises are a portion of the building (the "Building") shown on the Site Plan, which Building contains approximately 21,514 square feet. Landlord grants Tenant, together with its employees, suppliers, contractors, authorized representatives, invitees, permitted assigns and sublessees, (i) the exclusive use of those areas shown on the Site Plan as the "Dumpster Area", "Exclusive Parking Spaces" (the "Exclusive Use Areas"), (ii) a non-exclusive easement for parking and for use of any means of ingress and egress in, to and from the Building  now or hereafter existing, including, but not limited to, driveways, loading areas, curb cuts, sidewalks and parking areas, in common with Landlord and Landlord's other tenants, and (iii) a non-exclusive easement to use all other areas of the Building made available for common use (items (i), (ii) and (iii) being referred to collectively herein as the "Common Area").

(b)     Shopping Center. The Building  is located within a larger commercial development (the "Shopping Center") consisting of approximately 21,514 square feet, as shown on the Site Plan attached hereto as Exhibit B.

(c)     Landlord further grants to Tenant, and its employees, suppliers, contractors, authorized representatives and invitees, the non-exclusive right to use any means of ingress and egress to and from the Building and the Shopping Center, insofar as Landlord has the right to grant such use.

(d)     The Shopping Center is subject to a reciprocal easement agreement entered into by and among Pickerington Retail Ventures Ltd., and B & G Realty, Inc. aka Marcus Theatre Corporation, as amended (the "Shopping Center REA"). Tenant shall review and approve the Shopping Center REA as an Initial Conditions Precedent (as defined in Article 22 of this Lease).

(e)     Landlord agrees that it shall take no action adverse to the exercise of Tenant's rights under this Lease or the use of the Premises by Tenant hereunder and that it will vote against or otherwise oppose any such adverse action by the declarant and/or the other property owners which are subject to the Shopping Center REA as defined in Article 2(d) above and which have such approval rights. Landlord shall not vote or agree to modify Shopping Center REA in any manner

which would adversely affect Tenant, the use and enjoyment of the Premises under this Lease or Tenant's rights under this Lease in more than a *de minimis* manner.

(f)　Subject to Tenant's satisfaction and/or waiver of all conditions precedent under Article 22 hereof and except as otherwise expressly provided in this Lease, including, without limitation, Landlord's maintenance obligations in Article 8 hereof, and Landlord's obligation to perform Landlord's Remedial Obligations (as hereafter defined), Tenant shall accept the Premises in "AS IS, WHERE IS" condition.

2A.　EXISTING TENANT. (a) The parties hereto acknowledge and agree that Landlord's tenant, KC Prestige Worldwide, LLC D.B.A. The Corner; A Bar and Grill ("Existing Tenant"), no longer occupies the Premises under a lease dated September 18, 2012 which expired by its terms on June 30, 2021 ("Existing Lease").

(b)　Landlord hereby represents and warrants to Tenant that (i) the Existing Lease has expired by its terms prior to the execution of this Lease; and (ii) there is no provision in the Existing Lease providing the Existing Tenant with: (A) an option to extend or renew the Existing Lease, and/or (B) a right of first refusal or an option to purchase all or any portion of the Premises.

3.　TERM. (a) Unless sooner terminated or extended as herein provided, the term of this Lease shall be for seven (7) years (the "Term"). Unless this Lease is otherwise terminated, the Term shall commence on the first day of the first calendar month following the date (the "Rent Commencement Date") which is sixty (60) days after Landlord has received Tenant's written notice of satisfaction of all conditions precedent under Article 22. Landlord and Tenant each agree that upon the other's written request they will execute and deliver a commencement letter acknowledging the actual commencement date of the Term the Rent Commencement Date and the expiration date of the Term (excluding any options to extend the term referenced below). In the event that Tenant is delayed in its build-out of the Premises due to any act or omission of Landlord, its agents, contractors or employees required to be performed by Landlord by the express terms of this Lease after notice to Landlord, and Landlord's failure to cure within five (5) business days, (a "Landlord Delay"), then the aforementioned sixty (60). day period shall be extended three (3) days for every day of Landlord Delay. In the event that any Landlord Delay continues for a period of more than fourteen (14) consecutive days after notice thereof to Landlord, then Tenant shall have the right to terminate this Lease upon written notice to Landlord. In the event that Tenant terminates this Lease, Landlord shall, within ten (10) days of receipt of Tenant's termination notice, reimburse Tenant for all hard and soft costs incurred in connection with this Lease and the Premises including, without limitation, all costs associated with preparation of architectural and engineering plans, reports and studies and all reasonable legal fees.

(b)　So long as Tenant is not then in monetary default beyond any applicable notice and cure period, Landlord grants to Tenant three (3) successive options to extend the Term upon the same terms, covenants and conditions of this Lease, for any period of time up to but not exceeding five (5) years for each option (each, an "Extended Term"). If Tenant elects to exercise one or more options, Tenant shall notify Landlord at least sixty (60) days prior to the expiration of the Term or any Extended Term in effect at the time of the notice.

4.　RENT. (a) Tenant agrees to pay Landlord rent in the monthly amount set forth in the table below on or before the fifth (5th) day of each and every month in advance without demand or

deduction or abatement as provided herein, at its offices or other such places as Landlord may from time to time direct in writing for each and every month during the Term and any Extended Term, in advance on or before the fifth (5th) day of each month. Payments of rent not received by the close of business of the sixth (6th) day of the month shall be subject to a late charge of ten percent (10%) of the rent payment not received to offset administrative expenses and other costs incurred by Landlord. If the fifth (5th) day of the month falls on a weekend or holiday, then the payment must be received by the close of business on the next business day following the fifth (5th) of the month or a late charge of ten percent (10%) shall be assessed. Should the Rent Commencement Date occur on a day other than the first day of a calendar month, monthly rent shall be apportioned for that month only and shall be payable together with the monthly rent for the first full month of the Term. Rent may be paid, at Tenant's option, either (i) by check and sent by ordinary first class mail to Landlord at the address set forth in Article 34 below, or (ii) by ACH transfer to an account designated from time to time by Landlord in writing to Tenant. Landlord shall designate an account for ACH transfer promptly upon receipt of written request from Tenant.

| Lease Year | Annual | Monthly |
|---|---|---|
| 1-3 (Initial Term) | $76,800.00 | $6,400.00 |
| 4-7 (Initial Term) | $80,640.00 | $6,720.00 |
| 8-12 (First Extended Term) | $87,091.20 | $7,257.60 |
| 13-17 (Second Extended Term) | $95,800.32 | $7,983.36 |
| 18-22 (Third Extended Term) | $105,380.40 | $8,781.70 |

(b)      The term "Lease Year" as used herein shall mean a period of twelve (12) consecutive months beginning on the commencement of the Term as provided in Article 3, as to the first Lease Year, and any anniversary thereof as to subsequent Lease Years.

(c)      If at any time during the Term or Extended Term, less than fifty percent (50%) of the gross rentable square feet of the Building (excluding the Premises) is occupied by open and operating tenants, then, in lieu of the monthly rent set forth in the table above, Tenant shall pay alternative rent in an amount equal to seventy percent (70%) of the monthly rental amount then due and payable hereunder for every month during which such occupancy requirements are not satisfied. In the event that less than fifty percent (50%) of the gross rentable square feet of the Shopping Center (excluding the Premises) is occupied by open and operating tenants for a period of twelve (12) consecutive months, then Tenant shall have the right to terminate this Lease upon written notice to Landlord.

5. USE. The Premises may be used up to twenty-four (24) hours per day for any form or combination of the storage, transportation, preparation, distribution, delivery, pick-up, retail sale, rental or provision of merchandise and services customarily sold, rented or provided from time to time, at stores operated or franchised by Tenant or at supermarkets or grocery markets of any type and character operated within the supermarket or grocery industry as of the date of this Lease or in the future and including product lines, services and special features or departments included in such grocery markets or supermarkets, including but not limited to groceries, produce, sundries, meat, dairy, delicatessen, ready-to-eat, made to order, and take-out food products (including without limitation whole or partial pizza pies, and fried food, including without limitation chicken) for off-premise consumption, coffee, hot chocolate and other brewed beverages, beer, wine and alcoholic beverages (with beer, wine and alcoholic beverages all being sold for off-premises consumption), cellular devices and related products, phone cards, movies and video games, automotive products, donuts and other types of pastry products, cigarettes and other tobacco products, devices which simulate tobacco or other smoking, such as, for example, electronic cigarettes and vaporizers, magazines. The Premises may be used for any other lawful purpose which is not in direct conflict with any exclusive use provision contained in leases covering other businesses located in the Building which other leases are dated prior to the date of Tenant's execution of this Lease and which exclusive use provisions have been provided to Tenant prior to Tenant's execution of the Lease and are set forth on Exhibit C attached hereto. Nothing herein shall require Tenant to continuously operate at the Premises.

5A. RIGHT TO RECAPTURE. (a) It is expressly acknowledged by Landlord that this Lease contains no implied or express covenant for Tenant to continuously conduct business in the Premises. Tenant's election to discontinue operations in the Premises shall not be a default, but Tenant shall remain responsible to comply with the provisions in this Lease, including payment of rent and additional expenses, real estate taxes and insurance. However, in the event Tenant (i) beginning not later than ninety (90) days after the Rent Commencement Date, shall fail to open for business; provided, however, that Tenant may, but shall not be required to, open for business seven (7) days per week and/or twenty-four (24) hours per day; or (ii) discontinues operations in the Premises (excluding, however, an Exempted Discontinuance, as defined below), and such discontinuance of operations continues for one hundred twenty (120) consecutive days, Landlord may, at any time thereafter during the Term or any Extended Term (so long as Tenant does not recommence operations), elect to terminate this Lease and regain possession of the Premises by written notice to Tenant (the "Termination Notice"), in which event this Lease (and all obligations of the parties hereunder) shall terminate sixty (60) days after the date of Tenant's receipt of the Termination Notice unless by such sixtieth (60th) day Tenant is open and operating at the Premises or has entered into a written assignment or sublease (with any consents required hereunder) and the assignee or sublessee is open and operating at the Premises or in the process of making expeditious and diligent efforts to design, obtain permits for or construct renovations, fixturize, stock or open for business and continues to do so promptly and with due diligence and upon completion promptly opens for business at the Premises but in no event later than one hundred twenty (120) days after Tenant's receipt of the Termination Notice.

 (b) The following discontinuances of retail operations shall be exempted from the applicability of Landlord's right to terminate hereunder ("Exempted Discontinuance"): (i) during the restoration of the Premises pursuant to Article 12 hereof; (ii) if it is prevented from doing so by reason of a force majeure event described in Article 37 of this Lease; (iii) during reasonable periods

of time while alterations permitted hereunder are being made to the Premises; (iv) for periods of seven (7) days or less when inventory is taken or other administrative functions are performed; (v) during severe weather conditions which materially adversely affect customers' or employees' ability to travel to the Premises; (vi) following the occurrence of a taking or condemnation; (vii) during the last month of the Term provided Tenant is actively engaged in vacating the Premises; or (viii) during any federal, state or local holidays In no event shall Tenant's failure to continuously use the Premises as required in this Article 5A be deemed a default of Tenant under this Lease

6.    UTILITIES.  (a)  Tenant agrees to pay all charges for gas, electricity, telephone, sewer, water and any other utilities used by Tenant on the Premises. If feasible, Landlord shall provide separate utility company meters at the Premises to monitor Tenant's use of all such utilities (excluding telephone and sewer). Tenant will be responsible for ensuring that all billing statements for all separately metered utilities will be mailed directly to Tenant for payment.  In the event Landlord receives utility billing statements, Landlord shall immediately forward same to Tenant for payment and shall cooperate with Tenant to assure that such statements are thereafter sent directly to Tenant.

(b)    In the event it is not feasible for Landlord to provide separate utility company meters at the Premises to monitor Tenant's use of utilities, Landlord agrees to sub-meter the Premises such that Tenant's utility use is separately accounted for. Landlord agrees to forward to Tenant a monthly bill for all such utilities (excluding telephone and sewer) for the prior month as evidenced by the sub-meter. Landlord agrees that Tenant will not be liable for, and Landlord will forfeit all rights to recover utility payments from Tenant if presentation of the statement therefor is not made to Tenant within twelve (12) months after the end of the month to which the utility charges relate. In no event will Tenant be responsible for any penalty, interest or other cost except where resulting from Tenant's failure to pay a utility invoice submitted on a timely basis by Landlord as required by this section.

(c)    Landlord represents that the following utilities: (i) natural gas, (ii) electricity, and (iii) sewer and water have been brought and made available to, and currently serve, the Premises.

(d)    Landlord represents that (i) a dedicated 3 phase 800 amp electric service is available (without any representation or warranty as to the condition of such service) for use by Tenant at or in the Premises, and (ii) the electric service serving the Premises is either separately metered as of the date hereof, or Landlord shall, at its sole cost and expense, separately meter the Premises. Tenant shall be permitted, but not obligated, to upgrade the electric service to a dedicated 3 phase 1600 amp electrical service.

(e)    If, due to any act or omission by Landlord, its agents, employees or contractors, any utility or other service to the Premises is interrupted for forty-eight (48) consecutive hours or more and, as a result thereof, Tenant is unable to continue its normal business operations in the Premises, all rent, additional rent and other charges payable hereunder shall be equitably reduced for the period during which such interruption exists taking into account all of the relevant facts and circumstances. In the event of any such interruption of any utility or other service to the Premises, Landlord shall use reasonable diligence to restore such service as soon as practicable.

7. TAXES. (a) Tenant agrees to pay all real estate taxes levied upon its personal property, including trade fixtures and inventory, located on the Premises. Tenant shall reimburse Landlord for all taxes and assessments for the Premises that are due and payable during the Term and any Extended Term after presentation to Tenant by Landlord of actual real estate tax statements or copies thereof (which show the tax rate, assessed value, breakdowns of direct assessments and penalties, if applicable) and receipts evidencing payment thereof from the taxing jurisdiction(s) in which the Premises are located. If an assessment that is payable in periodic installments is levied on the Premises, Tenant shall (i) pay only those installments that are attributable to the Term, and Extended Term, if applicable, and (ii) be responsible to reimburse Landlord only for those periodic installments which would have been owed had Landlord elected the maximum time period permitted for payout of the installments. Tenant shall not be responsible for any assessments that are pending, levied, assessed, imposed or due on the Premises or the Building prior to the commencement of the Term. Real estate taxes for the first and final year of the Term or the final year of any Extended Term, if applicable, shall be prorated between Landlord and Tenant based upon the commencement and expiration of the Term or Extended Term. Tenant shall pay only the lowest discounted amount and will not be required to pay any penalty, interest or cost resulting from Landlord's failure to pay such taxes and/or the delinquent payment of such taxes by Landlord.

(b) If a separate tax statement is not available for the Premises, the amount of taxes for which Tenant shall be liable under this Lease shall be a percentage of the total amount of such taxes levied against the Building, which percentage shall be determined by dividing the amount of gross leasable square feet in the Premises by the total amount of gross leasable square feet of the Building, whether or not leased or occupied (the "Pro Rata Share"). Landlord represents that the total gross leasable square feet of the Building is 21,514, and thus Tenant's Pro Rata Share is 4,800/21,514, or 2.23%. In no event shall the total amount of gross leasable square feet of the Building be less than the amount set forth in the immediately preceding sentence.

(c) Tenant will not be liable for, and Landlord will forever forfeit all rights to recover, such taxes and assessments if presentation of statements and corresponding receipts evidencing payment thereof are not made by Landlord to Tenant in the manner set forth above within twelve (12) months after the applicable date of delinquency.

(d) If a separate real estate tax statement is available for the Premises Landlord may direct the taxing jurisdiction(s) to send tax statement(s) with respect to the Premises only directly to Tenant. Landlord shall promptly notify Tenant when it has so directed such taxing jurisdiction(s). Landlord further agrees that Tenant, at Tenant's sole expense, may contest any taxes before any taxing jurisdiction or maintain any necessary legal action in reference to such taxes or for the recovery of any taxes paid. Landlord agrees to execute any documents reasonably required by Tenant in connection with any such contest. Landlord agrees to promptly provide Tenant with copies of annual tax valuation assessments for the Building (or for the Premises, if a separate tax statement is available therefor) so that Tenant may determine whether or not to contest the valuation or taxes assessed for the Premises.

8. LANDLORD'S MAINTENANCE. (a) In addition to Landlord's obligations with respect to the Common Areas as set forth in Article 29 below, at all times during the Term and any Extended Term, Landlord agrees at its sole expense (i) to maintain the foundation, slab, and structural soundness of the Premises and of the Building, and further, without limitation (ii) to keep in good

repair the heating and air conditioning equipment (unless installed by Tenant), plumbing and electrical wiring servicing the Premises, (iii) to keep in good repair the roof of the Premises and Building, and (iv) to keep in good repair the exterior of the Premises and of the Building. Landlord acknowledges and agrees that Tenant, has the right to request Landlord to make the aforesaid repairs for maintenance and/or repair of any of the items named, described or referred to in said sections (i) through (iv) above. At all times during the Term and any and all Extended Terms Landlord shall provide Tenant with a working telephone number and contact information for a person who Tenant, its employees or contractors may contact, on a twenty-four (24) hour per day, seven (7) days per week basis, concerning any such required repair(s) and/or maintenance. Landlord further agrees to use good faith, commercially reasonable efforts to undertake the aforesaid maintenance and/or repair. Tenant agrees at its sole expense to keep the interior of the Premises in good repair including electrical, plumbing, heating, ventilation and air conditioning equipment (if installed by Tenant) to the extent located within and exclusively serving the Premises and shall be responsible for all glass (casualty damage and reasonable wear and tear excepted). Landlord represents and warrants that upon delivery of the Premises to Tenant pursuant to Article 42 hereof, all systems serving the Premises including, without limitation, the heating, ventilation and air conditioning, electrical, plumbing and life safety systems, shall be in good working order and condition.

(b) If Landlord shall fail to perform or pay for its obligations in accordance with this Article 8 (collectively, the "Maintenance Obligations"), Tenant may notify Landlord of such failure in writing. If Landlord fails to perform (or commence and thereafter diligently pursue to completion the performance of any such Maintenance Obligations) or make payment for such Maintenance Obligation(s) within two (2) business days of Tenant's notice (except that no notice shall be required in the event of an emergency), then Tenant may, at its option, perform or pay for the Maintenance Obligations, in either event as Landlord's agent. If Tenant shall so elect, Tenant may withhold rent to the extent of the reasonable, out-of-pocket documented expenses incurred by Tenant in performing or paying for the Maintenance Obligations, with such documented expenses being delivered to Landlord promptly after all such Maintenance Obligations performed by Tenant have been completed. Tenant shall not be deemed thereby to be in breach of this Lease, and such right of withholding rent shall not be deemed the exclusive remedy of, nor an election of remedies by, Tenant.

8A. **TENANT'S MAINTENANCE:** (a) Tenant shall keep and maintain the entire Premises (excluding the structure and/or any Maintenance Obligations of Landlord as set forth in Article 8 of this Lease) in good order, condition and repair (including any such replacement and restoration as is required for that purpose) and every part thereof wherever located, including, without limitation, the exterior and interior portion of all doors, windows, plate glass and store front, all plumbing fixtures and all portions of the mechanical, plumbing and electrical systems exclusively serving and located within the Premises, and all portions of the HVAC system whether located within the Premises or outside the Premises, sprinkler systems, if any, walls, floors and ceiling, meters applicable to Tenant's Premises, and all installations made by Tenant under the terms of this Lease and any exhibits thereto, as herein provided but excluding any structural components which are Landlord's Maintenance Obligations. Tenant shall also make any repairs or replacements required to be made to the Premises or any part thereof due to theft, burglary, illegal entry or any damage to the Premises (unless by Landlord or its contractors, agents or employees or any party under the control or direction of Landlord) and Tenant shall make any repairs or replacements due to a strike

involving Tenant or its employees. Any charges to furnish service to the Premises made by any utility company or municipality shall be paid by Tenant within the time limit specified by such company or municipality, unless such charge results from the change of utility provider as decided by the Landlord.

(b)   Excluding Landlord's Maintenance Obligations, Tenant shall keep the Premises, sidewalks and areas adjoining the front and rear entrances of the Premises in a reasonably clean and safe condition and in accordance with all directions, rules and regulations of the proper officials of any governmental authority having jurisdiction, at the sole cost and expense of Tenant, and Tenant shall comply with all requirements of law, by statute, ordinance or otherwise, affecting the Premises and all appurtenances thereto (including the Americans with Disabilities Act as it may be amended or replaced as to the interior of the Premises only). Should Landlord determine that immediate or emergency repairs or maintenance be necessary within the Premises, Landlord shall notify Tenant or its on-site operator(s) by telephone, in person or by email of such necessity and the nature of the repairs or maintenance and notify Tenant of the time frame determined by Landlord in which the maintenance /repair must be completed. In such case Tenant shall commence and complete immediate/emergency maintenance and repairs within the time frame reasonably determined by Landlord. Landlord may, but shall not be required to, make and complete said maintenance or repairs and Tenant shall pay the documented direct out-of-pocket cost thereof to Landlord as other Additional Rent upon demand.   Tenant shall use pest control when necessary and shall not burn trash or garbage in or about the Premises, nor allow excessive amounts to accumulate. Tenant shall not use any sound system in such manner that the sound so reproduced shall be unreasonably audible beyond the interior of the Premises.  Tenant will use commercially reasonable efforts to prevent delivery trucks from blocking any passageway or driveway used in common with other tenants.  Tenant shall have no obligation to maintain any common areas except for the Exclusive Use Areas identified in Article 2 above.

(c)    Tenant will not cause or permit accumulation of any debris or extraneous matter on the roof of the Premises (which is due to activity of Tenant), will not in any manner cut or drive nails or otherwise mutilate the roof of the Premises such that it would void any roof warranty and will be responsible for any damage caused to the roof by any acts of Tenant, its agents, servants, employees or contractors of any type or nature. Tenant shall notify Landlord of any intentions to perform any work on the roof, or to make any penetrations for vents or equipment including without limitation the replacement of the HVAC condensing units and related equipment.  Any such work or penetrations to the roof shall be performed under the supervision of Landlord or its authorized agent.  If any such work is performed without supervision of Landlord, then any repairs needed to be made subsequent to such work being performed shall be made by Landlord and the cost thereof shall be billed to Tenant as other Additional Rent.

9,    ALTERATIONS.  (a)  Tenant shall not make any alterations involving structural, weight bearing changes to the Premises or the Building without securing Landlord's written consent, which consent shall not be unreasonably withheld, conditioned or delayed.  Tenant may make all other alterations or additions, including, without limitation, to the store front, the installation of double doors (currently a single door) in the shared corridor, signs, mansard or marquee which display Tenant's image and trade dress and other non-weight bearing alterations to the Premises as Tenant may desire, including alterations to non-weight bearing partitions.  Such alterations or additions will be made in a good workmanlike manner without cost to Landlord, and shall be free and clear of

69973296v 19 / 035043-640006

mechanics' and materialmen's liens provided that if any such lien is filed, Tenant shall either promptly bond or discharge the same or it may contest the same in good faith.

(b)     Landlord shall have no right to impede or make any changes to access to the Building or the Premises or to remove, cover, reduce the visibility of or alter Tenant's exterior image, trade dress or signage at the Premises, without Tenant's prior written consent.

10.     TRADE AND OTHER FIXTURES/SIGNAGE.     (a)     Subject to the approval of local governing authorities and the acquisition of any required permits, Tenant may install or cause to be installed at its expense such equipment and trade and other fixtures on, in or adjacent to the Premises, including its roof (subject to the Tenant's obligations set forth in Article 8A above relating to any of Tenant's activities on the roof), and/or the Exclusive Use Areas as are reasonably necessary for the operation of its business (the "Fixtures").  The Fixtures may include, without limitation, all heating, ventilation and air conditioning equipment if installed by Tenant (the "HVAC"), walk-in vault(s), exterior lighting, a satellite dish and/or similar communications equipment and Tenant's typical exterior imaging, signs, banners and other advertising displays, including Tenant's fascia signs and pole signs.  At the Tenant's sole cost and expense, Tenant shall have the right to install its sign panel on the Shopping Center's monument sign in the location currently occupied by the "Corner Bar & Grill".  Subject to Tenant's obligations set forth in Article 8A above relating to activities on the roof, the remote condensing units for Tenant's HVAC and for Tenant's refrigeration equipment shall be located on the roof of the Building, in the vicinity of the existing HVAC condensing units and related equipment are currently located on the roof of the Premises.  Landlord is responsible at its sole expense for any and all structural enhancements or upgrades needed to accommodate the placement of Tenant's HVAC and/or "flex-pack" and related equipment.

(b)     Landlord hereby waives any landlord's lien which Landlord may have under applicable law with respect to the Fixtures.

(c)     The Fixtures may be installed at any time following the delivery of the Premises to Tenant.  All Fixtures, whenever installed shall remain personal property, and title thereto shall continue in the owner thereof, regardless of the manner in which they may be attached or affixed.  Tenant, at Tenant's expense, may at any time during the Term or Extended Term remove any of the Fixtures and shall repair any damage caused by such removal.

(d)     Subject to Tenant's obligations relating to activities on the roof, Landlord grants Tenant a non-exclusive but continuous, unobstructed right to access and use the roof following Landlord's delivery of the Premises to Tenant and throughout the Term and any Extended Term in order for Tenant to access, install, maintain, repair and replace any of Tenant's equipment thereon which serves the Premises.  Subject to Tenant's obligations set forth in Article 8A above relating to activities on the roof, in connection therewith, Landlord shall at all times provide Tenant with access through any portion of the Building, 365 days a year, 24-hours a day, necessary to access the roof for the installation, maintenance, repair and replacement of Tenant's equipment thereon.

11.     PERMITS/LICENSES.  Landlord hereby grants to Tenant the right to apply for and obtain, in Landlord's name or otherwise, any permits or licenses required by applicable governmental authorities necessary or desirable for Tenant to undertake any construction and/or perform

maintenance, remodeling, alterations and repairs of the Premises, or to otherwise use the Premises in accordance with the terms and conditions of this Lease and Landlord agrees to execute any documents reasonably requested by Tenant in connection therewith.

12.　CASUALTY DAMAGE AND CASUALTY INSURANCE.　(a)　If, in the reasonable business judgment of Tenant, the Premises are rendered substantially unfit for the occupancy or use herein contemplated by any casualty insured against in a standard fire and extended coverage property insurance policy of the type then commonly purchased by owners of buildings in the area in which the Premises are situated (such a casualty being hereinafter referred to as an insurable casualty) and the then current Term shall have at least two years to run, Landlord, at Landlord's expense, shall seek any required consents from its mortgagee, and thereafter, promptly and diligently restore the Premises to the condition existing prior to the occurrence of the insurable casualty and all rental shall abate from the date of such occurrence until the Premises are so restored.

(b)　If, in the reasonable business judgment of Tenant, the Premises are rendered substantially unfit for the occupancy or use herein contemplated by any casualty other than an insurable casualty or by any casualty whatever when the then current Term shall have less than two years to run, Landlord may either promptly and diligently restore the Premises at Landlord's expense as above provided, in which event all rental shall abate from the date of such occurrence until the Premises are so restored, or Landlord may terminate this Lease effective as of the date of the occurrence of the casualty; provided, that Landlord shall not have the right to so terminate this Lease if the casualty or peril is an insurable casualty and within twenty (20) days after the occurrence of the casualty, Tenant exercises, or agrees to exercise, any option to extend the Term for a period of at least two (2) years beyond the date of the casualty or if the casualty is other than an insurable casualty and Tenant within twenty (20) days after the occurrence of the casualty agrees in writing to restore the Premises at Tenant's expense. If, in the reasonable business judgment of Tenant, the Premises are not rendered substantially unfit for the occupancy or use herein contemplated, Landlord shall promptly and diligently restore the Premises at Landlord's expense to the condition existing prior to the occurrence of the casualty and the rental shall not abate during such restoration period, provided Landlord is prompt and diligent in connection with the restoration.

(c)　Landlord agrees to maintain a standard fire and extended coverage property insurance policy on the Building of which the Premises are a part, including Tenant's improvements which comprise part of the Building (excluding any equipment and Fixtures). The policy shall be of the type commonly purchased by owners of comparable buildings in the area in which the Premises are situated, and shall insure the Building to one hundred percent (100%) of the Building's replacement cost throughout the Term of this Lease and any Extended Term. Each year during the current Term, Landlord shall furnish to Tenant a certificate of insurance naming Tenant as additional insured, as its interest may appear, evidencing that such insurance is in effect. Such certificate shall state on its face that such insurance shall not be subject to cancellation except after twenty (20) days prior written notice to Tenant of such cancellation. Tenant shall reimburse Landlord for its Pro Rata Share of the premium, based on standard rates for Tenant's then current use of the Premises and not based on the premium rate due to any other occupant's use within the Building or any vacancies or empty space within the Building.

13. WAIVER OF SUBROGATION. If either party to this Lease sustains loss or damage to the Premises or the Fixtures, goods, wares, merchandise or any other property located thereon, from which it is protected by an insurance policy, then, to the extent that such party is so protected, it waives any right of recovery from the other party. Each party agrees immediately to give to each insurance company which has issued to it a policy of fire and extended coverage property insurance written notice of the terms of such mutual waivers, and to cause any such insurance policy to be properly endorsed, if necessary, to prevent the invalidation of such insurance coverage by reason of such waivers.

14. LIABILITY INSURANCE. Tenant agrees, at Tenant's expense, to maintain in force continuously throughout the Term, and any Extended Term, commercial general public liability insurance covering the Premises with combined single limit coverage of $2,000,000.00 or its equivalent, and shall, upon Landlord's written request, furnish Landlord a certificate from the insurer evidencing such coverage and naming Landlord as additional insured under the policy but only as respects the Premises and only to the extent of liability resulting from occurrences arising out of the negligence of Tenant or its wholly owned subsidiaries, divisions, sublessees, assignees and employees. Notwithstanding the above, Tenant shall have the right to self-insure as to some or all of the risks covered by this Article provided Tenant maintains a net worth of not less than $50,000,000.00. Landlord agrees, at Landlord's expense, to maintain in force continuously throughout the Term, and Extended Term, if applicable, commercial general public liability insurance covering the Building (including the Premises) with combined single limit coverage of $2,000,000.00 or its equivalent, and shall upon Tenant's written request, furnish Tenant a certificate from the insurer evidencing such coverage.

15. INDEMNITY. Subject to Article 13, commencing on the date this Lease is fully executed by both parties and continuing during the Term, and any Extended Term, Tenant shall indemnify and hold Landlord harmless from any claim, liability, loss, cost or obligation asserted against Landlord by any third party, arising from any damage or injury caused by the use of the Premises by Tenant, its agents, employees or contractors, excepting in each case any such damages, injuries, claims, liabilities, losses, costs or obligations as shall result from conditions existing on the Premises prior to the commencement of the Term, negligent acts or omissions of Landlord, its agents, employees or contractors. Landlord agrees to indemnify and hold Tenant harmless from any liability, loss, cost or obligation arising from conditions existing on the Premises prior to the commencement of the Term, including, without limitation, the presence of Hazardous Materials (as defined in Article 22), acts or omissions of Landlord, its agents, employees or contractors or the failure of Landlord to perform its obligations under this Lease, excepting in each case any damages, injuries, claims, liabilities, losses, costs or obligations as shall result from negligent acts or omissions of Tenant, its agent, employees or contractors.

16. ASSIGNMENT OR SUBLEASE. Tenant shall have the right to assign this Lease or sublease the whole or any part of the Premises (including use of the Exclusive Use Areas) consistent with the terms of this Article 16. Prior to entering into any assignment or sublease, except as to a Permitted Transferee (as defined below in this Article), Tenant shall send Landlord written notice (the "Assignment Notice") with the name, address, contact information and proposed use for the assignee or sublessee so that Landlord can confirm that the assignee or sublessee does not violate any Exclusive Use Rights for tenants then having executed leases in the Shopping Center. Promptly after receiving the Assignment Notice, Landlord shall send Tenant a copy of all

Exclusive Use Rights in the Shopping Center and advise Tenant whether the assignee or subtenant violates any existing tenant's Exclusive Use Rights. Any assignment or sublease shall be subject to all of the terms, covenants and conditions of this Lease and Tenant shall remain primarily liable for the payment of rent and the performance of the terms, covenants and conditions of this Lease. Landlord shall not be obligated to recognize any such assignment or sublease unless and until such time as Tenant shall have notified Landlord in writing thereof and provided to Landlord the name, address, contact information and the proposed use for such assignee or sublessee. If Tenant fails to give Landlord the Assignment Notice as provided above, and, if the assignee's or sublessee's use violates any other tenant's then Exclusive Use Right, then the assignment or sublease shall be deemed void and Tenant shall terminate such assignment or sublease and cause the assignee or sublessee to cease operations. Provided, however, in no event shall the terms of this section apply to a demise by Tenant to a Permitted Transferee (as hereinafter defined). Notwithstanding anything to the contrary contained herein, a demise by Tenant for use as a Convenience Store (as defined in Article 26 below), or in connection with any of the following Permitted Transferees (as defined below in this section): to its franchisees or licensees, or to any parent, subsidiary, or division, or a merger or consolidation of Tenant with another corporation, or to an affiliate of Tenant, or to an independent entity in connection with financing or refinancing of the cost of construction of the improvements (each, a "Permitted Transferee"), shall not constitute an assignment or subletting for the purposes of this Article, and shall not require Landlord's prior written consent, but Tenant shall remain primarily liable for the payment of rent and the performance of the terms, covenants and conditions of this Lease. Any assignment or sublease shall be subject to all of the terms, covenants and conditions of this Lease and Tenant shall remain primarily liable for the payment of rent and the performance of the terms, covenants and conditions of this Lease.

17. **EMINENT DOMAIN.** (a) Landlord shall promptly notify Tenant in writing of any notice regarding any potential exercise of the power of condemnation or eminent domain, or any offer to purchase in lieu thereof, received by Landlord. If pursuant to the exercise of the right of condemnation or eminent domain (i) the Premises or Building are taken or conveyed under threat of the exercising of such right, or (ii) only a portion of the Premises or a portion of the Building is so taken or conveyed and Tenant determines in its reasonable business judgment that the remainder of the Premises or the Building (including Common Area and/or Exclusive Use Areas) or the visibility of the Premises or the Building is inadequate or unsatisfactory for its purposes, or (iii) Tenant's access to the Premises or the Building is reduced by such taking or conveyance, or other reconstruction or alteration of the roadways abutting the Building, whether or not property is actually taken from the Building for such reconstruction or alteration, and Tenant determines that its access to the Premises or the Building (including Common Area and/or Exclusive Use Areas) or the visibility of the Premises or the Building is inadequate or unsatisfactory for its purposes, Tenant shall have the right to terminate this Lease subject to Tenant's rights as set forth below. Such termination shall be effective on the date specified by Tenant's notice of termination, which date shall not be sooner than Tenant determines in its reasonable business judgment that its occupancy, use, or access (whichever is earlier) is inadequate or unsatisfactory for its purposes. The termination of this Lease as provided above shall not operate to deprive Tenant of the right, and Landlord expressly grants to Tenant the right, to make a claim for an award in condemnation, or participate in an award, for loss of business goodwill, lost profits, loss of access, relocation expenses, Tenant's leasehold interest and/or lease bonus value or leasehold advantage, loss or damage to Fixtures and improvements made by Tenant to the Premises or the Building, the value of Tenant's unexpired options to extend the Term, or any other claims that Tenant is permitted under

applicable law to make or elects to make, or to receive notices and participate in the condemnation proceedings, including any settlement negotiations, whether conducted prior to or after the filing of a condemnation proceeding so long as any such claim by Tenant does not diminish the award to which Landlord would otherwise be entitled. Landlord further agrees to provide to Tenant information regarding any settlement offers made to or by Landlord, any appraisal reports made on behalf of Landlord in connection with the condemnation proceeding, and all other data relevant to calculating the compensation or damages to which Tenant may be entitled in such a condemnation proceeding.

(b) If this Lease is not terminated as provided herein, Landlord and Tenant shall agree upon an equitable reduction in the rent. If the parties fail to agree upon such reduction within sixty (60) days from the date Tenant is required to give up such occupancy, use or access, whichever is earlier, Landlord and Tenant shall each choose one arbitrator and the two arbitrators so chosen shall choose a third arbitrator. The decision of any two of the arbitrators concerning the rent reduction, if any, shall be binding on Landlord and Tenant and any expense of the arbitration shall be divided equally between Landlord and Tenant. Any such reduction in rent shall not constitute an election of remedies by Tenant nor deprive Tenant of the right to make a claim for an award in condemnation as set forth above or receive notices and participate in the condemnation proceedings, including any settlement negotiations.

(c) If (i) pursuant to the exercise of the right of condemnation or eminent domain any portion of the Shopping Center (other than the Building) is taken or conveyed under threat of the exercising of such right, and (ii) Tenant determines in its reasonable business judgment that access to the Building and/or the Premises from roadways abutting the Premises, any common areas within the Shopping Center, or the visibility of the Premises is rendered inadequate or unsatisfactory for its purposes, Tenant shall have the right to terminate this Lease subject to Tenant's rights as set forth below. Such termination shall be effective on the date Tenant determines in its reasonable business judgment that its access or the visibility of the Premises, the Building or Shopping Center is rendered inadequate or unsatisfactory for its purposes. Landlord further agrees to provide to Tenant information regarding any settlement offers made to or by Landlord, any appraisal reports made on behalf of Landlord in connection with the condemnation proceeding, and all other data relevant to calculating the compensation or damages to which Tenant may be entitled in such a condemnation proceeding.

18. ATTORNEYS' FEES. If suit is brought to enforce any terms, covenants or conditions of this Lease, the parties agree that the losing party shall pay the prevailing party's reasonable attorneys' fees, including reasonable attorneys' fees incurred in enforcing a judgment, which shall be fixed by the court and court costs. As used herein, the term "prevailing party" shall mean the party, which has succeeded upon a significant issue in the litigation and achieved a material benefit with respect to the claim at issue, taken as a whole.

19. DEFAULT. (a) If Tenant defaults in the payment of the monthly rent, Landlord shall promptly notify Tenant in writing. Should Tenant fail to cure such default within twenty (20) days after receipt of such notice, Landlord shall have the right to terminate, this Lease by sending Tenant written notice thereof. Upon Tenant's receipt of such notice, this Lease shall terminate as fully and completely and with the same effect as if that date were fixed for the expiration of the Term or any Extended Term and all rights of Tenant, including occupancy of the Premises, shall terminate.

Upon termination, Tenant shall not be relieved of liability as provided herein. Landlord may reenter and repossess the Premises, removing all persons therefrom without prejudice to any remedies for arrears of monthly rent or any other sums otherwise due, or breach of any other covenants hereunder. Within a reasonable period of time following such reentry and repossession, Landlord shall use commercially reasonable and diligent efforts to relet the Premises on such terms and conditions and for such uses as Landlord may reasonably determine to mitigate Landlord's damages as a result of Tenant's default hereunder. Landlord shall collect and receive any rent or any other sums otherwise due which may be payable by reason of such reletting. Tenant shall be liable for and pay to Landlord all monthly rent or any other sums otherwise due up to and including the date of such reentry and repossession; and, thereafter, Tenant shall, until the end of what would otherwise have been the then current Term, be liable to Landlord for and shall pay to Landlord, all monthly rent or any other sums otherwise due less the net proceeds of any reletting as set forth herein, after deducting from such proceeds all of Landlord's reasonable expenses incurred in conjunction with such reletting. Tenant shall pay such monthly rent or any other sums otherwise due on the days on which they would be payable hereunder in the absence of Tenant's default.

(b)     If Tenant defaults in the performance of any of the terms, covenants and conditions of this Lease other than the payment of monthly rent, Landlord shall promptly notify Tenant in writing. If Tenant fails to cure such default within thirty (30) days after receipt of such notice, or if the default is of such character as to require more than thirty (30) days to cure and Tenant fails to commence to cure within thirty (30) days after receipt of such notice and thereafter to proceed diligently to cure such default, then in either such event Landlord may cure the default and Tenant shall promptly reimburse Landlord for any expenses incurred by Landlord, but any such default shall not cause the forfeiture of this Lease or of Tenant's right of possession.

(c)     If Landlord defaults in the performance of any of the terms, covenants and conditions of this Lease, Tenant shall promptly notify Landlord in writing. If Landlord fails to cure such default within thirty (30) days after receipt of such notice, or if the default is of such character as to require more than thirty (30) days to cure and Landlord fails to commence to cure within thirty (30) days after receipt of such notice and thereafter diligently proceed to cure such default then, in either such event, Tenant, at its option, may, to the extent permitted by the law of the jurisdiction in which the Premises is located, (i) cure such default and setoff or deduct any expense plus an administrative fee equal to fifteen percent (15%) so incurred from the rent or other amounts due, (ii) cancel and terminate this Lease and/or (iii) bring an action against Landlord, at law or in equity, arising out of such breach. Failure by Landlord to reimburse any overpayments by Tenant of rental or other charges, within twenty (20) days after receipt by Landlord of notice of such overpayment and documentation evidencing same, shall constitute a default by Landlord hereunder.

20.     INTENTIONALLY OMITTED.

21.     INTENTIONALLY OMITTED

22.     DUE DILIGENCE/CONDITIONS PRECEDENT. (a) Tenant and Landlord shall promptly proceed with reasonable diligence to satisfy each of the following conditions precedent (the "Initial Conditions Precedent") within one hundred eighty days (180) after the full execution and delivery of this Lease (the "Due Diligence Date"). This Lease shall automatically terminate ten (10) days

after the expiration of the Due Diligence Date, unless Tenant has notified Landlord in writing that the Initial Conditions Precedent have been fulfilled or waived in writing:

(i)  construction bids and/or cost estimates for Tenant's construction in connection with Tenant's use and occupancy of the Premises being obtained, and which in Tenant's opinion make Tenant's construction economically feasible;

(ii)  all permits, licenses and approvals, with conditions acceptable to Tenant, required for (A) the construction and use of the Premises for the uses permitted under Article 5, (B) 24-hour operations, and (C) installation of Tenant's fascia signs on the Premises and any Common Area signage having been obtained by and at the expense of Tenant, including, without limitation, approvals required under any applicable zoning, environmental, wetlands, subdivision control, sanitary, health, safety and land use laws and regulations;

(iii)  all permits, licenses and approvals, with conditions acceptable to Tenant, required for the uses set forth in Article 5 above, including the sale or rental (as appropriate) of groceries, produce, meat, dairy, delicatessen, ready-to-eat and made to order food products for off-premise consumption, beer, wine and alcoholic products, cigarettes and other tobacco products, devices which simulate tobacco or other smoking, and sundries, having been obtained by and at the expense of Tenant;

(iv)  samples, test borings, percolation, groundwater and other tests (including, but not limited to, testing for hydrocarbons, hazardous substances, toxic pollutants, asbestos, lead paint, mold, and other contaminants, and information pertaining to the environmental condition of the Premises and the Building (herein collectively "Hazardous Materials"), being obtained by Tenant as agent for Landlord showing environmental conditions satisfactory to Tenant and the appropriate governmental authorities.  Landlord shall report any condition revealed by such tests to the extent required by applicable law, and Tenant shall have no responsibility or liabilities therefor;

(v)  all Title Objections (as hereinafter defined) shall have been satisfied or waived as provided in Article 24, and all documents required to be executed under Article 24 shall have been executed by Landlord and all other necessary parties and delivered to Tenant;

(vi)  Landlord shall have executed and delivered such instruments or agreements providing ingress/egress and access rights, in form and substance acceptable to Tenant;

(vii)  Landlord shall have executed and delivered to Tenant a Non-Disturbance Agreement (as defined in Article 31 below) executed by any mortgagee(s) listed on Exhibit D and from any other then current mortgagee(s);

(viii)  Landlord shall have delivered any required operational documents executed by the necessary parties, in form and substance acceptable to Tenant, which encumber or will encumber, the Premises or land of which the Premises are a part,

including, without limitation, the Shopping Center REA and/or any Reciprocal, Easement Agreement and/or any Covenant, Conditions and Restrictions, together with any collateral documents required for the validity, enforcement and recording thereof (collectively, the "Operational Documents");

(ix)   Tenant shall be satisfied with its site investigation report;

(x)    The Existing Tenant shall have vacated the Premises and all leases or other occupancy agreements for the Premises shall have been terminated.

(b)    It is understood and agreed that, in the event that the satisfaction of any of the Initial Conditions Precedent set forth in this Article 22 is delayed due to any act or omission of Landlord (including, without limitation, Landlord's failure after notice to Landlord describing the act or omission, and Landlord's failure to cure within three (3) business days (the "Cure Period") (i) to deliver any applications required in order to process and approve permits and approvals for the construction and use of the Premises, (ii) to deliver any Operational Documents executed by the applicable parties, or (iii) to deliver the Access Agreement (hereinafter defined) executed by Landlord in accordance with Article 28 hereof or (iv) to otherwise satisfy Landlord's obligations under this Lease), then, at Tenant's option, the Due Diligence Date shall be extended commencing upon expiration of the Cure Period by the same number of days that satisfaction of the Initial Conditions Precedent has been delayed due to the act or omission of Landlord.

(c)    Should Tenant elect to appeal any adverse ruling, initiate legal proceedings or defend any third party action to satisfy any of the Initial Conditions Precedent, the Due Diligence Date shall be extended for the period of time that Tenant continues to pursue the satisfaction of same through such appeal or legal proceedings, but in no event for longer than three (3) months. Tenant shall not be entitled to extend the Due Diligence Date pursuant to the terms of this subsection unless Tenant has first notified Landlord of the circumstances. Tenant shall use commercially diligent and reasonable efforts to resolve any matters giving rise to its rights under this subsection.

(d)    Notwithstanding the foregoing provisions of this Article or any other provisions of this Lease, if Tenant determines, in Tenant's reasonable business judgment, at any time, that (i) there is a reasonable likelihood that one or more of the Initial Conditions Precedent will not be satisfied, or (ii) development of the Premises (including, without limitation, access) and/or permitting for such development or Tenant's intended use shall be commercially and/or economically impractical, then Tenant shall have the right to terminate this Lease in accordance with the provisions of this Article. Each party shall fully cooperate with the other in seeking such permits, approvals and licenses, and in conducting such tests.

(e)    Notwithstanding the foregoing provisions of this Article or any other provisions of this Lease, if Tenant has commenced the permitting process and is, with reasonable diligence, pursuing the permitting process to completion, and Tenant has not received notice of the denial of any such permit or approval, then the Due Diligence Date shall be automatically extended if Tenant so notifies Landlord for the period of time until such decision is rendered and all appeal periods have expired, but in no event for a period to exceed three (3) months.

(f)     Prior to Landlord's delivery of the Premises to Tenant, Landlord agrees to allow Tenant and/or its agents, upon at least twenty-four (24) hours prior notice to Landlord (which, for purposes of this section only, may be oral or by E-mail), access to the Premises for the inspections, tests, and studies contemplated under this Lease.

If Tenant exercises its rights under this Article 22, and/or 24 to terminate the Lease, then Tenant shall restore the Premises to the condition that existed on the last date of execution of this Lease by Landlord and Tenant. If Tenant does not send a notice of termination under Articles 22 or 24 prior to the Due Diligence Date, the Initial Conditions Precedent and the review of the Binder and Survey shall be deemed to have been satisfied.

23.     **CONDITION OF THE PREMISES.** Subject to Landlord's obligations set forth in Articles 27 and 28 below, Tenant accepts the Premises in its current condition it being acknowledged and recognized that Landlord shall have no obligation to remove any existing personal property or trade fixtures presently in the Premises.

24.     **LEASEHOLD TITLE POLICY.** (a) Tenant may, at Tenant's expense, obtain through a title company acceptable to Tenant (the "Title Company") preliminary title documentation for extended coverage leasehold title insurance, and, at Tenant's option, an A.L.T.A. survey (the "Survey") acceptable to Title Company for such title insurance and a report by a surveyor acceptable to Tenant locating and describing the Premises and the Building and certifying as to easements and encroachments. A preliminary title report or binder (the "Binder") shall be issued giving the current condition of title to the Premises and the Building, together with copies of all instruments necessary to fully explain the scope and effect of any matters listed as exceptions in the Binder whereby Title Company is bound to issue to Tenant or its nominee, for an amount to be determined by Tenant, an A.L.T.A. Title Insurance Policy-Standard Form 2006, or such other form as shall be acceptable to Tenant, with extended coverage (the "Title Policy").

(b)     In the event the Binder or the Survey reflects any matters or conditions which Tenant determines will interfere with its intended development or use of the Premises, or the rights granted Tenant in this Lease, Tenant may so notify Landlord and Landlord shall undertake all reasonable efforts to cure such title objections (the "Title Objections") within twenty (20) days after receipt of such notice and to notify Tenant of the curative matters (the "Landlord's Cure Notice"). Tenant shall have ten (10) additional business days after receipt of Landlord's Cure Notice to examine any curative matters. In the event Landlord is unable to cure to Tenant's satisfaction one or more Title Objections within such twenty (20) day period, Tenant may either (i) waive such uncured Title Objection, or (ii) terminate this Lease.

(c)     In addition, Tenant may terminate this Lease in the event that there shall first arise during the period between the date of the Binder and the Rent Commencement Date any matters or conditions which Tenant reasonably determines will interfere with its intended development or use of the Premises, or the rights granted Tenant in this Lease, and which Landlord does not cure within twenty (20) days after receipt of notice thereof from Tenant. Landlord covenants that it shall not at any time following Landlord's execution of this Lease place any encumbrance that adversely affects Tenant's rights under this Lease (i) upon the title to the Premises, (ii) upon the Building affecting the Premises without Tenant's prior written consent thereto.

(d)    Landlord agrees that promptly upon request it shall execute, record and deliver such documents as Title Company may require in order to establish Landlord's title to the Premises and in order to issue a Title Policy in form and substance acceptable to Tenant including, without limitation, a memorandum or short form lease as referenced in Article 35 hereof, a Non-Disturbance Agreement, and any matters required of Landlord by the Title Company in any "requirements" or similar portion of the Binder.

25.    **INTENTIONALLY DELETED**

26.    **EXCLUSIVE.** (a) Landlord agrees that, during the Term and any Extended Term, (i) Tenant shall have the exclusive right ("Exclusive Use Right") to operate a convenience store ("Convenience Store") in the Building and in any Adjacent Property (defined below) owned by Landlord or Landlord Related Owner (as defined below), and (ii) no occupant of the Building or any Adjacent Property other than Tenant shall operate a Convenience Store. For purposes of this Article, a Convenience Store shall mean retail establishment with its primary business to provide the public a convenient location to quickly purchase a variety of single - and individual -serving size products such as by way of example, snack foods, dairy products and drinks, all of the foregoing being primarily for off-premises consumption, with such Convenience Store being similar to those operated as QuikTrip, Racetrac, Valero, Buc-ee's, Go Puff and Dash Mart as opposed to grocery stores specializing in a wide variety of products, including single-serve and family-sized products, produce and non-food items. For the avoidance of doubt, a Convenience Store shall not include (1) any retail establishment containing greater than 10,000 square feet, (2) any retail establishments that primarily sell either single or limited categories of foods or products such as card shops, yogurt and/or ice cream shops, book stores, newsstands, sporting goods and apparel (but excluding a tobacco store, which shall be expressly prohibited), (3) a small format grocery store, such as, by way of example only, and without limitation, a Trader Joe's or Aldi, (4) grocery stores or markets having as their principal business the sale of ethnic foods or products such as, by way of example only, and without limitation, selling Mexican, Somali, Japanese, Chinese or other types of ethnic foods. Provided however, the foregoing Exclusive Use Right shall only apply during the Term and any Extended Term of this Lease.

(b)    Landlord agrees to protect Tenant's and Tenant's franchisees at the Premises Exclusive Use Right hereunder in any future sale or lease of all or any portion of the Building. Landlord shall not enter into any lease for occupancy of the Building or any Adjacent Property owned by Landlord that violates Tenant's Exclusive Use Right hereunder, and shall promptly, at its expense, take all appropriate legal action to stop any sales or rentals in violation of Tenant's exclusive rights. If any of the above covenants are found by court of competent jurisdiction to be unreasonable or unenforceable, then such covenants shall be limited only to the extent that such court determines are reasonable and enforceable. Landlord hereby grants Tenant the right to institute an action, including an action for damages or injunctive relief, against any tenant of the Building or any Adjacent Property which is operating in violation of the Exclusive Use Right contained in this Article, provided however that Tenant does not, by virtue of obtaining such right, waive any rights it may have against Landlord as a result of any such violation.

(c)    In the event that Tenant's Exclusive Use Right provided for herein is violated, Tenant shall send written notice (the "Exclusive Use Right Notice") to Landlord describing the alleged violation, giving Landlord thirty (30) days thereafter to cause the violation to cease. In the

**PAGE 18**

event Landlord is unable to cause the violation to cease, then in addition to any other remedies set forth in the Lease and/or as may be available at law or in equity, Landlord and Tenant acknowledge and agree that in lieu of the monthly rent set forth above, Tenant shall pay alternative rent in an amount equal to fifty percent (50%) of the monthly rental amount then due and payable hereunder for every month during which such Exclusive Use Right violation may occur. In the event that such violation continues for a period of more than thirty (30) days after Tenant sends Landlord the Exclusive Use Right Notice, then Tenant shall have the right to be exercised only within the period of six (6) months after Tenant's sending Landlord the Exclusive Use Right Notice, to terminate this Lease upon written notice to Landlord. In the event that Tenant so elects to terminate this Lease, Landlord shall, within thirty (30)) days of receipt of Tenant's termination notice, reimburse Tenant for all (i) of the unamortized portion of all hard and soft costs incurred in connection with this Lease and the Premises including, without limitation, all costs associated with preparation of architectural and engineering plans, reports and studies and up to Fifty Thousand Dollars ($50,000.00) of reasonable legal fees.

(d)   For the purposes of this Lease, the following terms shall have be defined as follows:

(i)   "Adjacent Property" means any premises, land, property, shopping center, or development (including, without limitation, the Shopping Center and/or any portion thereof) located adjacent to the Building owned by Landlord or Landlord Related Owner; except however, the Adjacent Property shall not include that portion of Fairfield County, Ohio parcel number 0410626410 located at the northeast corner of Freedom Way North and State Route 204 consisting of approximately 1.68 acres that is currently owned by Yarmouth Plaza Ltd. ("Yarmouth") and is under contract to be sold to United Dairy Farmers, Inc. Some, but not all, of the principals of Landlord are also principals of Yarmouth.

(ii)   "Landlord Related Owner" means Landlord and/or an entity owning an interest in any Adjacent Property which is in any manner affiliated with Landlord, such that Landlord (or the owner(s) of any interest in Landlord) directly or indirectly controls, is controlled by, or is under common control with such entity (or the owner(s) of any interest in such entity).

27.   LANDLORD'S COVENANTS. (a) Landlord covenants that (i) it has good and marketable fee simple title to the Premises and the Building, and the Premises and the Building are free of all leases, tenancies, agreements, encumbrances, liens, restrictions and defects in title in all cases that adversely affect the rights granted Tenant in this Lease, (ii) there are no unrecorded restrictive covenants, applicable to the Premises or the Building which will prevent the Premises from being used as permitted in Article 5 above. To the best of Landlord's knowledge, information and belief, the Premises and the Building are free from Hazardous Materials.

(b)   Landlord covenants that it shall comply with the last sentence of Article 24(c) above.

(c)   Landlord agrees that promptly upon request it shall execute, record and deliver such documents as Tenant may require in order to prepare and record a memorandum or short form lease as referenced in Article 35 hereof and a Non-Disturbance Agreement.

(d)     Within ten (10) days after full execution of this Lease and delivery of a copy to Landlord, Landlord shall deliver to Tenant any and all existing environmental and/or remediation reports and geotechnical studies with respect to the Premises or Building, and any title policies and surveys of the Premises or Building prepared or issued within the last five (5) years which are in Landlord's possession.

28.     **ENVIRONMENTAL OBLIGATIONS.**   (a) Landlord covenants that any underground storage tanks or facilities, previously located on or under the Premises have been properly removed and disposed of according to applicable laws, rules, regulations and ordinances to the satisfaction of the appropriate governmental authorities.   To the best of Landlord's knowledge, information and belief, the Premises and Building, including, but not limited to, the soil and groundwater on or under the Premises and Building, are free from Hazardous Materials.  Landlord acknowledges that Landlord shall be liable to Tenant and under applicable laws, rules, regulations and ordinances (and to the satisfaction of the appropriate governmental authorities), for the assessment and remediation of any Hazardous Materials and removal of any underground storage tanks or facilities existing on or beneath the Premises as of the Rent Commencement Date, including any conditions disclosed by the tests undertaken pursuant to Article 22(a)(iv) (the "Landlord's Remedial Obligations").

(b)     If Landlord shall, at any time after the execution of this Lease, be required to perform Landlord's Remedial Obligations, Landlord and Tenant shall enter into an agreement reasonably satisfactory to Tenant containing the following terms and conditions and such other terms and conditions as the parties shall mutually agree (the "Access Agreement"):

(i)     Tenant shall provide Landlord reasonable access to the Premises for the purpose of conducting Landlord's Remedial Obligations; provided that Landlord's Remedial Obligations shall be conducted by Landlord in a manner designed to cause the least possible interference with any ongoing construction by Tenant and the operation of the store and its business;

(ii)     Landlord shall undertake Landlord's Remedial Obligations, including, without limitation, any and all investigations, remediation and disposal of contaminated soil and/or groundwater (including any revealed during Tenant's construction) at Landlord's sole cost and expense and in accordance with all applicable federal, state and local laws, rules, regulations and ordinances;

(iii)     Landlord shall properly repair any damage to and/or restore the Premises and the Building as a result of Landlord's Remedial Obligations;

(iv)     indemnity by Landlord in connection with (X) Hazardous Materials and (Y) Landlord's Remedial Obligations;

(v)     Landlord and its agents and contractors shall maintain insurance coverage(s) reasonably acceptable to Tenant; and

(vi)     all reports and studies issued in connection with the performance of Landlord's Remedial Obligations shall be addressed to, and may be relied upon by, both Landlord and Tenant.

(c)     If Landlord's Remedial Obligations are identified prior to the Rent Commencement Date, and Tenant has not terminated this Lease pursuant to Article 22, then, prior to, and as a condition of the commencement of the Term, the parties shall execute and deliver the Access Agreement.

(d)     If Landlord shall fail to execute and deliver the Access Agreement or to perform or pay for its obligations (including Landlord's Remedial Obligations) in accordance with this Article or the Access Agreement, Tenant may, at its sole option, elect to either (i) perform or pay for such obligations as Landlord's agent, including executing manifests or reports and submissions to governmental authorities in Landlord's name, or (ii) terminate this Lease by notice to Landlord. If Tenant shall elect to perform or pay for such obligations, Tenant may withhold rent to the extent of expense incurred by Tenant in performing or paying for such obligations. Tenant shall not be deemed thereby to be in breach of this Lease, and such right of withholding rent shall not be deemed the exclusive remedy of, nor an election of remedies by, Tenant.

(e)     Intentionally Deleted.

(f)     Without limiting Landlord's Remedial Obligations, and as a condition to commencement of the Term, Landlord covenants that Landlord shall remove no later than the Due Diligence Date any and all asbestos-containing materials ("ACM") as defined by the U.S. Environmental Protection Agency and/or presumed asbestos-containing materials ("PACM") as defined by the Occupational Safety and Health Administration, mold and/or lead-based paint which may be present in or at the Premises, or which may be present elsewhere in the Building but which may cause exposure of persons in the Premises to ACM, PACM, mold and/or lead based paint. All such removal, transportation and disposal of ACM, PACM, mold and/or lead-based paint shall be in accordance with all federal, state and local laws, rules, regulations and ordinances and at Landlord's sole cost and expense. Any such removal activity shall be coordinated with Tenant and Landlord shall use commercially reasonable efforts to minimize the interruption to Tenant's operations or construction. Landlord and Tenant agree to reasonably cooperate with each other in connection with such removal activity. Landlord agrees to indemnify, defend and hold Tenant harmless from and against any and all claims, demands, damages, actions, orders, expenses or any other liability including attorney fees and costs, and from any resulting judgment, settlements, fines, or penalties for: (i) personal injuries arising from exposure to ACM, PACM, mold and/or lead-based paint in or at the Premises or the Building, (ii) property damage arising from ACM, PACM, mold and/or lead-based paint released from the Premises or the Building, and (iii) cost of cleanup or containment of ACM, PACM, mold and/or lead-based paint in or at the Premises or Building. Landlord's failure to comply with the provisions of this Article shall be subject to the terms and conditions of Article 19(c) respecting Landlord's default under this Lease.

29.     COMMON AREA.  (a)  At all times during the Term and any Extended Term, Landlord shall be responsible for maintaining, cleaning, ice and snow removal, trash removal and lighting the Common Area, including, without limitation, maintenance and repair where warranted of all means of ingress and egress to and from the Building, all landscaping, parking areas, loading areas, mezzanines and driveway areas, the Exclusive Use Areas and all sidewalks which serve the Building. Landlord's out of pocket cost and expenses of performing the foregoing services, provided such costs and expenses shall not exceed the reasonable and customary expense for such services in the area in which the Premises are located, are herein collectively referred to as the "Common Expenses." Common Expenses may also include the reasonable cost of insurance

required to be obtained by Landlord pursuant to Article 12(c) of this Lease. In no event shall any brokerage, leasing, management, accounting, legal, administrative, clerical, remodel or similar fees or costs with respect to the Building, or costs of acquisition of new land or construction of new buildings, capital expenditures, any expenditures for which Landlord is reimbursed from any source, including, without limitation, insurance and condemnation proceeds and expenses in connection with services or other benefits of a type that are not provided to another tenant or occupant of the Building, be a part of the Common Expenses. Tenant shall pay its Pro Rata Share of such Common Expenses. Landlord shall invoice Tenant for Tenant's share of such Common Expenses which invoice, at Landlord's option, shall be on either a monthly or a calendar quarter basis. Such invoice shall show in reasonable detail the Common Expenses and shall include Landlord's representation that the Common Expenses referred to therein have been paid by Landlord and shall be forwarded to Tenant's office at the address provided in Article 34 below.

(b) Notwithstanding the foregoing, in no event shall Tenant's Pro Rata Share of Common Expenses during the first (1st) full calendar year of the Term be greater than Five and 57/100 Dollars ($5.57) per square foot or Twenty-Six Thousand Seven Hundred Thirty-Six and 00/100 Dollars ($26,736.00). Following the first (1st) full calendar year, in no event shall Tenant's Pro Rata Share of Common Expenses increase in any successive calendar year (prorated on a per diem basis for any partial calendar year) by more than four percent (4%) of the amount paid by Tenant for Tenant's Pro Rata Share of Common Expenses in the immediately preceding calendar year (excluding taxes pursuant to Article 7 of this Lease, insurance pursuant to Article 12(c) of this Lease and snow and ice removal).

(c) If requested by Tenant, Landlord shall provide Tenant with such information or data (including without limitation, invoices evidencing the work performed) as may be reasonably requested to verify the amount of the Common Expenses, or, if requested by Tenant, Landlord shall permit Tenant to audit Landlord's books and records maintained by Landlord in connection with the Common Expenses. Such request to be made within 180 days of receipt of the reconciliation Tenant shall give Landlord reasonable notice of its intention to conduct such an audit which shall be conducted at Landlord's offices. The cost of such audit shall be borne by Tenant; provided, however, that in the event the audit reveals that the actual Common Expenses are more than five percent (5%) less than the Common Expenses reflected in the statement(s) presented by Landlord which are the subject of the audit, Tenant's reasonable cost of conducting the audit shall be borne by Landlord.

(d) If Landlord fails to invoice Tenant for Common Expenses within twelve (12) months after calendar year end of the incurrence of the Common Expenses to which such invoice relates, then Landlord's right to reimbursement of same shall be forever forfeited and waived.

(e) That part of the Common Area which primarily serves the customers of the Premises shall be adequately lighted at night during Tenant's business hours. In the event Tenant reasonably determines that the dumpster capacity for the Building as made available to Tenant, either alone or in conjunction with the other tenants of the Building is inadequate, Tenant will so notify Landlord and Landlord will at Landlord's cost and expense expand the dumpster capacity so that Tenant is provided with dumpster capacity that is sufficient for Tenant's operations in the Premises in Tenant's reasonable opinion.

30.   QUIET ENJOYMENT.  Landlord represents and covenants that, upon paying the rent and performing the terms, covenants and conditions of this Lease, Tenant shall peaceably and quietly have, hold and enjoy exclusive possession of the Premises, all appurtenances belonging thereto, and all rights granted to Tenant by this Lease for the entire duration of the Term and any Extended Term without any hindrance or interference by Landlord or any person acting by, through or under Landlord or deriving rights through Landlord.  Notwithstanding anything to the contrary in this Lease, Landlord hereby represents and covenants that promptly upon receipt of written notice from Tenant of a violation of Tenant's rights to quiet enjoyment of the Premises under this Lease, Landlord shall take all reasonable actions necessary to restore Tenant's full rights to quiet enjoyment of the Premises, as provided herein.  In the event that Tenant's full rights have not been restored within thirty (30) days following Landlord's receipt of such notice, and notwithstanding anything to the contrary in this Lease, Tenant shall be entitled to exercise any and all remedies permitted under this Lease, including under Article 19(c) pertaining to Landlord's default.

31.   SUBORDINATION.  Tenant agrees that its leasehold interest in the Premises will be subordinate to the lien of any mortgages now on, or hereafter to be placed on, the Premises or the Building; provided, as a condition precedent to such subordination, that each such mortgagee shall have delivered to a Tenant a non-disturbance agreement in form and substance reasonably satisfactory to Tenant in which each such mortgagee shall expressly covenant, that so long as Tenant is not in default under this Lease beyond any applicable notice and cure periods, Tenant's quiet possession of the Premises and all rights of Tenant under this Lease shall remain undisturbed, upon the terms, covenants and conditions stated herein, whether or not the mortgage is in default and notwithstanding any foreclosure or other action brought by the mortgagee ("Non-Disturbance Agreement").  The Non-Disturbance Agreement shall be substantially in the form attached hereto as Exhibit E or such other form as reasonably approved by Landlord's mortgagee.  Landlord represents and warrants that there are no mortgages or similar encumbrances affecting the Premises or the Building except as shown on Exhibit D, and Tenant acknowledges that Landlord must obtain the consent of such mortgagee to the Landlord's entering into this Lease as a condition precedent to Landlord's obligation hereunder.  Landlord shall request the consent of its mortgagee upon finalization of the terms of this Lease, and deliver it to Tenant within not less than thirty (30) days after the full execution of this Lease.  Provided that Landlord complies with the requirements of this Article, Tenant agrees to comply with reasonable requests for execution of documentation to effect the subordination of its leasehold interest subject to and in accordance with the terms of this Article.  Notwithstanding the foregoing, Landlord shall deliver, prior to the commencement of the Term, Non-Disturbance Agreement(s) executed by any mortgagee(s) holding a mortgage or similar encumbrance affecting the Premises or the Building as of the commencement of the Term.  Tenant shall have the right to mortgage or pledge as collateral the leasehold interest created by this Lease.  Landlord and Tenant further agree that if Landlord's mortgagee requires payment of a review fee prior to negotiating or executing any Non-Disturbance Agreement, then Landlord agrees to pay mortgagee such fee upon ten (10) days written request by Tenant or mortgagee.

32.   BANKRUPTCY.  Should Tenant make an assignment for the benefit of its creditors, or seek an order for relief under the United States Bankruptcy Code, Landlord, at its option, may terminate all rights of Tenant under this Lease, if permitted by applicable law.

33.   CHANGE OF OWNERSHIP.  Landlord shall provide Tenant written notice in the event Landlord conveys title to the Building, or assigns Landlord's interest in this Lease to another party.

Such notice shall include such party's tax identification number and shall be accompanied by documents (including a W-9 Form or similar tax documents) which evidence the transfer of title or assignment of interest and the effective date thereof. After receipt of such notice, rent and other payments due and future notices to Landlord shall be given to the party designated therein and Tenant shall attorn to the new owner as substitute Landlord. Should Landlord fail to provide the required notice or documentation, or should Tenant be reasonably uncertain concerning the proper party to whom rent is due, Tenant may withhold rent thereafter accruing until Tenant is furnished the required notice, documentation and/or satisfactory proof as to the party entitled thereto. Tenant shall, within thirty (30) days of receipt of request, execute for Landlord an estoppel certificate concerning the terms of this Lease.

34.  NOTICES. Any notices required or permitted hereunder shall be in writing and delivered to the other party by: (a) courier; (b) United States Certified Mail, Return Receipt, postage prepaid; or (c) a nationally recognized overnight courier, shipping charges prepaid, to the addresses set forth below or to such other addresses as either party may designate in writing and deliver as provided in this Article. All notices provided via e-mail or facsimile will not constitute notice.

LANDLORD:

Pickerington Retail Ventures, LTD
c/o Plaza Properties, Inc.
3016 Maryland Ave.
Columbus, Ohio 43209
Tax Identification No. 30-0269177
Attn: President

with a copy to:

Pickerington Retail Ventures, LTD
c/o Plaza Properties, Inc.
3016 Maryland Ave.
Columbus, Ohio 43209
Attn: Chairman

(it being understood and agreed that Tenant's failure to deliver a copy of the notice to the above address shall not affect the effectiveness of said notice to Landlord)

TENANT

| | |
|---|---|
| Tax statements and support to: | CAM statements and support to: |
| 7-Eleven, Inc. | 7-Eleven, Inc. |
| P.O. Box 711 | Cypress Waters |
| Dallas, Texas 75221-0711 | 3200 Hackberry Road |
| Attn: Ad Valorem Tax, Store # _____ | Irving, Texas 75063 |

69975296w.19 / 035045-940006

*Attn: CAM Dept., Store #*_____

**ALL OTHER COMMUNICATIONS, INCLUDING ANY NOTICES OF DEFAULT, TO:**

7-Eleven, Inc.
Cypress Waters
3200 Hackberry Road
Irving, Texas 75063
*Attn: Corporate Real Estate, Store #*_____

35. RECORDATION. This Lease shall not be filed for public record. However, as a condition to the commencement of the Term of this Lease, Landlord and Tenant shall execute and acknowledge a memorandum or short form lease (which will include, without limitation, a description of any exclusive use provisions contained in this Lease, a sufficient legal description of the Building, Tenant's rights under Article 11, Article 44, Article 45, Article 46 and Tenant's exclusive rights under Article 26 which may be filed for record by either party at any time after the execution of this Lease, setting forth the parties, description of the Premises, Term, Extended Term, and any other provisions mutually agreed upon. Landlord agrees that it shall execute and deliver such other documentation as may be reasonably required in order to record the memorandum or short form lease.

36. BROKER. Landlord and Tenant covenant, warrant and represent that no broker has been involved in the negotiation or consummation of this Lease other than Cardinal Commercial Real Estate, which Broker represents Landlord and Excess Space Retail Services, which broker represents Tenant (collectively, the "Broker"). Landlord agrees to pay the Broker's commission in accordance with a separate agreement between Landlord and Broker. In addition there shall be a separate three percent (3%) fee paid by Landlord to LGR Realty Inc. Tenant and Landlord each agree to indemnify and hold the other harmless from and against all causes of action and liabilities arising out of a claim for a commission by any broker purporting to have acted on behalf of the indemnifying party.

37. FORCE MAJEURE. Except for the payment of money required to be paid pursuant to the terms of this Lease, no party hereto shall be required to perform any term, obligation, covenant or condition of this Lease so long as such performance is delayed or prevented by force majeure (as defined below), and the time for performance of such term, obligation, covenant or condition shall be extended by the number of days equivalent to the number of days of such delay or prevention; provided however, for a party to exercise its rights hereunder, it must first send the other party written notice (the "Force Majeure Notice") describing the event of Force Majeure. In addition, any time periods or deadlines given in this Lease to a party for the pursuit or completion of due diligence, permitting, satisfaction of contingencies or conditions, construction or installation of improvements, or other activities or purposes (including, without limitation, the period provided to Landlord to complete any delivery obligations and the period provided to Tenant (to complete construction and open for business) between delivery of the Premises and commencement of the Term and payment of rent) shall be extended by the number of days such party is delayed by force majeure in such activities or purposes for which the time period or deadline is given commencing on the date of the Force Majeure Notice. The term "force majeure" or "Force Majeure" shall mean any acts of God; enemy acts; acts of war; acts of terrorism or bioterrorism; riot, insurrection or other

699772964 34 / 035045-940006

civil commotion; intervention by civil or military authorities of government; declared state of emergency or public health emergency; pandemic (including, without limitation, COVID-19); government-mandated quarantine or travel ban; government-mandated closure (including, without limitation, closure of buildings, airports, harbors, railroads and/or pipelines or other infrastructure); general unavailability of certain materials; strikes, boycotts, lockouts, labor disputes or work stoppage; and/or any other cause not reasonably within the control of such party and which, by the exercise of due diligence, such party is unable, wholly or in part, to prevent or overcome. In no event shall insufficiency of funds required to perform any term, covenant or condition of this Lease constitute force majeure.

38. **HOLDOVER.** Should Tenant remain in possession of the Premises after the expiration of the Term or any Extended Term, Tenant shall be deemed to be occupying the Premises as a month-to-month tenant, at a monthly rental equal to one hundred fifty percent (150%) of the rent payable during the last month of the Term or any Extended Term.

39. **APPLICABLE LAW.** The laws of the state in which the Premises are located shall govern the validity, performance and enforcement of this Lease. The invalidity or unenforceability of any provision of this Lease shall not affect or impair any other provision.

40. **COMPLETE AGREEMENT.** This Lease merges all prior negotiations and understandings between the parties and constitutes their complete agreement which is binding upon Landlord and the heirs, executors, administrators, successors and assigns of Landlord when executed by Landlord, and is binding upon Tenant, its successors and assigns, only if executed by a Vice President or Attorney-in-Fact of Tenant, regardless of any written or verbal representation of any agent, manager or other employee of Tenant to the contrary. This Lease may only be amended by written agreement signed by Landlord and Tenant.

41. **DUE AUTHORITY.** Landlord and Tenant each warrant and represent, upon which warranty and representation the other party has relied in the execution of this Lease, that each party has full right and lawful authority to execute this Lease in the manner and upon the conditions and provisions herein contained, and that no consent to the execution of this Lease is required.

42. **INTENTIONALLY DELETED.**

43. **DRAFTING.** Landlord and Tenant agree that this Lease has been drafted and negotiated by both parties, and neither party shall be deemed to be the draftsperson for purposes of construing provisions of this Lease.

44. **SIGNAGE.** (a) Landlord agrees that Tenant, subject to any required local governmental approvals, may install and maintain, at its sole expense, its standard fascia signage at the Premises to the full extent permitted by law. All of Tenant's signs may display Tenant's federally registered service marks. Tenant shall obtain, at its expense, any necessary permits prior to the installation of such signs.

(b) Without limiting Tenant's rights in the next sentence, throughout the first twelve (12) months of the Term of this Lease, subject to any required local governmental approvals, Tenant may display promotional banners and awnings in and around the Premises and adjacent portions of the Building for its grand opening. Tenant may in all events be permitted to display its weekly and

monthly promotional signage at the Premises (including, without limitation, on the windows of the Premises), without Landlord's consent.

(c)    Without limiting any of Tenant's rights to erect and maintain signage under this Lease, subject to any required local governmental approvals, Tenant shall have the right, without any additional charge, to use any common signage facilities at the Building and to install its sign panel on the Shopping Center's monument sign as provided in Article 10(a) above.

(d)    Landlord agrees that all signs at the Building will be constructed and located in such a manner which will not detract from the visibility of Tenant's fascia signs. In no event shall Landlord place any "For Lease" signs or the like on the Premises or within the Building in such a manner that will either detract from the visibility of the Premises or Tenant's fascia signs or interfere with Tenant's normal business operations at the Premises.

45.    LANDLORD'S RENOVATIONS AND REMODELING. (a)   In the event Landlord renovates, remodels, or enlarges (by constructing additions, acquiring additional land or otherwise) the Building (collectively, "Landlord's Construction") and Landlord's Construction adversely affects Tenant's business or operations in the Premises, Tenant shall have the right, after notice (the "Construction Notice") to Landlord describing with reasonable detail, the construction activities or impediments that are adversely affecting Tenant's business, and Landlord failure to cure same within five (5) business days after receipt of Tenant's Construction Notice, in Tenant's reasonable business judgment, to elect any of the following upon written notice to Landlord:

(i)    Tenant shall have the right to temporarily cease operations in the Premises, in which event rent, additional rent and all other charges payable by Tenant hereunder shall abate during such time as Tenant ceases operations in the Premises and, at Tenant's election, the term of this Lease shall "toll" in accordance with the provisions of this Lease.

(ii)    Tenant may continue to operate Tenant's business in the Premises; however, all Rents payable by Tenant hereunder shall be reduced based upon all of the relevant facts and circumstances (but such reduction shall be no lower than fifty (50%) of the rent then due and payable), as reasonably determined by Tenant and Landlord.

(iii)    In no event shall Tenant be responsible for any of the costs or expenses paid or incurred by Landlord in performing any Landlord's Construction, and no portion of the aforesaid costs and expenses shall be included in any of the charges payable by Tenant hereunder. Landlord shall diligently prosecute Landlord's Construction to completion without interruption or delay, in a first-class and in a good and workmanlike manner. If Landlord's Construction affects the roof of the Building or shall otherwise result in other work required in the Premises, including, without limitation, upgrading any construction or systems in the Premises to comply with applicable building codes, Landlord shall perform such other work as may be required, all at Landlord's sole cost and expense.

(b)   Subject to compliance with applicable laws, any scaffolding, barricade, "dog house" or other construction aid (collectively, "construction aids") or covering utilized or authorized by Landlord in connection with any construction performed or authorized by or on behalf of Landlord during the term of this Lease shall be constructed and maintained above the level of Tenant's

69973296v.19/015043-940006

storefront and signage and otherwise in a manner so as not to block or diminish access to or visibility of the Premises, and Tenant shall have the right to place its name, logo and advertising content on any such construction aids to the extent permitted by applicable laws.

(c)     Landlord shall use diligent efforts to perform any such work which requires the use of any construction aids.

46.     **ADDITIONAL PARKING REQUIREMENTS.**  Tenant shall have the sole and exclusive right to use twelve (12) parking spaces (the "Exclusive Parking Spaces") as shown on the Site Plan. Tenant, at its sole cost and expense, shall have the right to maintain signs, striping or curb painting at each of 7-Eleven Exclusive Parking Spaces stating that the same are for "15 Minute Parking Only," "7-Eleven Customer Parking Only" or such other message reasonably required by Tenant, subject to applicable laws, rules, regulations, and ordinances.  Landlord shall enforce the parking restrictions with respect to Tenant's Exclusive Parking Spaces in accordance with applicable laws, rules, regulations, and ordinances.

47.     **ELECTRONIC SIGNATURES.**  This Lease shall not be effective unless and until the same has been executed and delivered by all parties hereto. To facilitate the execution of this Lease, the parties may execute and exchange counterparts of signature pages affixing their signature by means of an electronic signature tool, application, or software (e.g., DocuSign). Each such electronic signature of a party shall be treated as an original as if personally signed by that party.

*[Remainder of page intentionally left blank.]*

*[Signatures appear on the following page.]*

69973296v.19/035045-940006

EXECUTED BY TENANT on _____7/28/2021_____.

Attest:                                    7-ELEVEN, INC., a Texas corporation

By: _Robin D. Bryant_____        By: _Ian Williams_____
    Robin D. Bryant, Assistant Secretary       Name:  Ian Williams, Vice President

69973296v.18

EXECUTED BY LANDLORD on the date set forth in the Notary's statement below.

LANDLORD

PICKERINGTON RETAIL VENTURES, LTD., an Ohio limited liability company

By: _____
Laurence G. Ruben, Managing Member

STATE OF OHIO )
) SS:
COUNTY OF FRANKLIN )

*This is an acknowledgement certificate; no oath or affirmation was administrated to the signer with regard to this notarial act.*

The foregoing instrument was acknowledged before me this 20th day of July, 2021 by Laurence G. Ruben, Managing Member of Pickerington Retail Ventures, Ltd, an Ohio limited liability company, on behalf of said limited liability company.

Sonya L. Barlow
Notary Public, State of Ohio
My Commission Expires 04-15-2025

_____
Notary Public

-Signature Page-

6997329⁵ˣ⁺ 19 / 035045-940006

(x)   Exhibit A:  Description of Premises
(x)   Exhibit B:  Site Plan
(x)   Exhibit C:  Existing Exclusive Use Provisions
(x)   Exhibit D:  Mortgagees
(x)   Exhibit E:  Form of SNDA

## Exhibit A

### Description of Premises

The Premises contains approximately 4,800 square feet, shown on the site plan attached as **Exhibit B**, on the ground floor of the Building located at the Shoppes at Hunters Run, which Building is shown on the **Exhibit B** Site Plan

## Exhibit B

## Site Plan



Exhibit C

Existing Exclusive Use Provisions

1. **Smoothie King:** Throughout the term, as it may be extended under the terms of this Lease, Tenant shall have the exclusive right in the Shopping Center, subject to current tenants, their subtenants and/or assignees in the Shopping Center whose leases do not contain reference to Tenant's exclusivity, Landlord agrees that it will not lease space to another tenant in the center which sells smoothie drinks or vitamins as its primary use.

2. **Salon Lofts:** Landlord hereby grants Tenant an exclusive for the Intended Use, including the retail sale of hair care products for use on or off-premises within the Property. During the term, as it may be extended, no portion of the Shopping Center, with the exception of the Premises, shall be used or operated as a beauty salon. Landlord agrees not to lease to or permit the operation of any other beauty salon, in the rest of the Shopping Center, including the proposed adjacent building based on site plan shown as Exhibit A, or any other buildings on or additions to the Shopping Center. However, Landlord may lease portions of the Shopping Center to retailers which sell hair care and beauty products but who do not use or apply such products to customers on-site, e.g. "Sally Beauty".

3. **Nail Essence:** Throughout the term, as it may be extended under the terms of this Lease, Tenant shall have the exclusive right in the Shopping Center, subject to current tenants, their subtenants and or assignees in the Shopping Center whose leases do not contain reference to Tenant's exclusivity, Landlord agrees that it will not lease space to another tenant in the Shopping Center which operates a nail salon as its primary use.

4. **Orange Leaf Yogurt:** Subject to current tenants, their subtenants and assignees whose leases do not contain a reference to Tenant's exclusivity, throughout the term, as it may be extended under the terms of this Lease and so long as Tenant is open and operating, Tenant shall have the exclusive right in the Shopping Center for the primary purpose of operating a store for the production and sale of yogurt and toppings. Subject to current tenants, their subtenants and assignees whose leases do not contain a reference to Tenant's exclusivity throughout the term, as it may be extended under the terms of this Lease, Landlord agrees that it will not lease space to another tenant in the Shopping Center for the primary purpose of operating a store for the production and sale of yogurt and toppings.

5. **FUGU Japanese:** Throughout the term as it may be extended under the terms of this Lease and so long as Tenant is open and operating its restaurant, Tenant shall have the exclusive right in the Shopping Center to operate as a full service Asian/sushi restaurant. Subject to current tenants, their subtenants and/or assignees in the Shopping Center whose leases do not contain reference to Tenant's exclusivity, Landlord agrees that it will not lease space to another tenant in the center which operates as a full service Asian/sushi restaurant.

6. **El Vaquero Mexican:** Subject to current tenants and their assignees and subtenants whose leases do not contain a reference to Tenant's exclusivity, throughout the term as it may be extended under the terms of this Lease and so long as Tenant is open and operating its restaurant, Tenant shall have the exclusive right in the Shopping Center to operate as a full service dine-in restaurant serving Mexican food. Subject to current tenants, their subtenants and/or assignees in the Shopping Center whose leases do not contain reference to Tenant's exclusivity, Landlord agrees that it will not lease space to another tenant in the center which operates as a full service dine-in restaurant serving Mexican food.

7. **HearingLife Hearing Center:** Throughout the term as it may be extended under the terms of this Lease and so long as Tenant is open and operating its current business Tenant shall have the exclusive right in the Shopping Center to operate as a business for the sale and service of hearing aids and providing hearing services. Subject to current tenants, their subtenants and/or assignees in the Shopping Center whose leases do not contain reference to Tenant's exclusivity, Landlord agrees that it will not lease space to another tenant in the center which operates as a business for the sale and service of hearing aids and providing hearing services.

## Exhibit D

## Mortgagees

Mortgage/Deed of Trust between Landlord and Wells Fargo Bank, National Association dated as of April 6, 2017 and recorded with the Fairfield County, Ohio Recorder's Office on April 7, 2017 at Book 1735, Page 532.

**Exhibit E**

Form of SNDA

[See attached]

PREPARED BY AND
MAIL RECORDED ORIGINAL TO:
Legal Department (Store No. _____)
7-Eleven, Inc.
3200 Hackberry Road
Irving, Texas 75063

## SUBORDINATION, NON-DISTURBANCE AND ATTORNMENT AGREEMENT

This Subordination, Non-Disturbance and Attornment Agreement (this "Agreement"), made by and among 7-ELEVEN, INC., a Texas corporation ("Tenant"), with principal offices at 3200 Hackberry Road, Irving, Texas 75063; _____, a _____ ("Lender"), whose address is _____; and _____, a _____ ("Landlord"), whose address is _____, executed to be effective as of the date of the last party's execution hereof (the "Effective Date").

### RECITALS:

WHEREAS, Lender has agreed to make a loan to Landlord, to be secured by a _____, dated _____ and filed in the official records of _____ County, State of _____ (the "Official Records") on or about _____, as Instrument No. _____, Book _____, Page _____ (together with all amendments, renewals, modifications, consolidations, spreaders, combinations, supplements, replacements, substitutions, and extensions, either current or future), and an assignment of all leases relating thereto, including the Lease (as defined below) (the "Security Instrument"), encumbering Landlord's ownership interest in real property located at _____, which is more particularly described in Exhibit A, attached hereto and made a part hereof (the "Premises");

WHEREAS, pursuant to that certain Building Lease dated _____ (together with all amendments and modifications thereto, the "Lease"), evidenced by that certain Memorandum of Lease recorded or to be recorded in the Official Records, Landlord has leased all or part of the Premises to Tenant (the "Leased Premises");

NOW THEREFORE, to confirm their understanding concerning the legal effect of the Security Instrument and the Lease and, in consideration of the mutual covenants and agreements contained in this Agreement and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Landlord, Lender and Tenant, intending to be legally bound, agree and covenant as follows:

1. **SUBORDINATION.** Subject to the provisions of Sections 2 and 3 below, the Security Instrument shall constitute a lien on the Premises that is prior and superior to the Lease, and to the leasehold estate created by it. By this Agreement, the Lease, the leasehold estate created by it, together with all rights and privileges of Tenant under it, are subordinated, at all times, to the lien or charge of the Security Instrument in favor of Lender, and all supplements, amendments, modifications, renewals and extensions of the Security Instrument.

2. **NON-DISTURBANCE.** By execution of this Agreement, Lender consents to the Lease. So long as the Lease is then in full force and effect and Tenant is not in material default under the Lease (beyond any period given Tenant by the terms of the Lease to receive written notice of any such default and the time period stated therein to cure) in the payment of rent or other amounts owed pursuant to the Lease or in the performance of any of the material terms, covenants or conditions of the Lease on Tenant's part to be performed, then Lender, any successor or assign of Lender, or any owner of the Premises following a foreclosure sale or conveyance in lieu of foreclosure (collectively, the "Lender Entitles") acknowledge and agree that: (i) Tenant's possession of the Leased Premises, or any extension or renewal rights therefor in the Lease, shall not be disturbed, diminished or interfered with by the Lender Entities, (ii) the Lease shall not be terminated and all of Tenant's rights and privileges under the Lease shall be recognized by the Lender Entities, and (iii) the Lender Entities will not join Tenant as a party defendant in any action or proceeding foreclosing the Security Instrument unless such joinder is necessary to foreclose the Security Instrument and then only for such purpose and not for the purpose of terminating the Lease.

3. **ATTORNMENT.** If (i) Lender or its successors and assigns shall become the owner of the Premises, (ii) the Premises shall be sold by reason of foreclosure or other proceedings brought to enforce the Security Instrument, or (iii) the Premises shall be transferred by deed in lieu of foreclosure, the Lease shall continue in full force and effect as a direct lease between the then owner of the Premises and Tenant, and Tenant agrees to attorn to the owner of the Premises, said attornment to be effective and self-operative without the execution of any further instruments. Except as otherwise provided in Paragraph 6 below, Tenant shall be under no obligation to pay rent to Lender or any such other owner until Tenant receives written notice from Lender or any such other owner that it has succeeded to Landlord's interest under the Lease, upon which notice Tenant shall be entitled to rely.

4. **NOTICE TO CURE DEFAULTS.** Tenant agrees to provide to Lender a copy of any notice of default served upon Landlord which with the passage of time or otherwise would entitle Tenant to cancel the Lease or abate the rent under the Lease. Tenant further agrees that if Landlord shall have failed to cure such default within the time provided for in the Lease, then Lender shall have an additional thirty (30) days after its receipt of notice within which to cure such default or if such default cannot be cured within that time, then such additional time as may be necessary to cure such default shall be granted if within such thirty (30) days Lender has commenced and is diligently pursuing the remedies necessary to cure such default (including, but not limited to, commencement of foreclosure proceedings necessary to effect such cure), in which event the Lease shall not be terminated while such remedies are being so diligently pursued, provided, that, such additional period of time shall not exceed ninety (90) additional days in the aggregate.

5.    LIMITATION OF LIABILITY. In the event that Lender succeeds to the interest of Landlord under the Lease, then Lender and any successor to Lender's interest in the Lease shall assume and be bound by the obligations of Landlord under the Lease which accrue from and after such party's succession to any prior landlord's interest in the Leased Premises, but Lender shall not be:

    a.   bound by any rent or additional rent which Tenant has paid more than one (1) month in advance to any prior landlord (including, without limitation, Landlord), except as expressly provided in the Lease;

    b.   liable for any act or omission of any prior landlord (including, without limitation, Landlord), except (a) for any tenant improvement allowance owed to Tenant under the Lease that has not been previously remitted to Tenant; or (b) to the extent a landlord default is non-monetary, relates to the repair or maintenance of the Premises, and continues to accrue after attornment, in which event, the successor landlord shall be bound to cure same within the time provided for in the Lease, which time shall be calculated from the date of attornment;

    c.   liable for the retention, application or return of any security deposit to the extent not paid over to Lender;

    d.   subject to any offsets or defenses which Tenant might have against any prior landlord (including, without limitation, Landlord), except as expressly provided in the Lease; or

    e.   bound by any amendment or modification of the Lease made after the Effective Date without Lender's written consent, such consent not to be unreasonably withheld or delayed, that: (a) reduces rent or additional rent payments to the landlord under the Lease, or (b) shortens the term of the Lease, or (c) imposes any additional material obligations upon the landlord under the Lease. All other amendments or modifications of the Lease that do not relate to the provisions set forth herein shall not require Lender approval.

    Notwithstanding the foregoing, nothing in this section shall be deemed to waive any of Tenant's rights and remedies against any prior landlord (including, without limitation, Landlord).

6.    ASSIGNMENT OF LEASES. Tenant consents to the Assignment of Leases contained in the Security Instrument (collectively, the "Assignment"). Tenant agrees that after any foreclosure action, sale under a power of sale, transfer in lieu of the foregoing, or the exercise of any other remedy pursuant to the Security Instrument, if Lender, pursuant to the Assignment, and whether or not it becomes a mortgagee in possession, shall give written notice to Tenant that Lender has elected to require Tenant to pay to Lender the rent and other charges payable by Tenant under the Lease, Tenant agrees that it shall pay rent and all other sums due under the Lease directly to Lender without notice to or the consent of Landlord and without any obligation on the part of Tenant to determine whether or not the demand is proper. Landlord agrees that Tenant shall have the right to rely on any such notice from Lender without incurring any obligation or liability to Landlord as if such notice were given at the direction of Landlord.

7. **LEASEHOLD IMPROVEMENTS AND BUSINESS FIXTURES.** Lender agrees that it will not claim and shall not have or assert any right, title or interest in and to any leasehold improvements and/or business fixtures installed upon the Leased Premises by Tenant pursuant to the terms of the Lease.

8. **NOTICES.** Any notices required or permitted hereunder shall be in writing and effective when delivered to the other party by: (a) courier; (b) United States Certified Mail, Return Receipt, postage prepaid; or (c) a nationally recognized overnight courier, shipping charges prepaid, to the addresses set forth below or to such other addresses as either party may designate in writing and deliver as provided in this Section 8. Any written correspondence delivered via e-mail or facsimile will not constitute formal notice.

If to Lender:                                              With a copy to:

_____       _____
_____       _____

Attn: _____       Attn: _____

If to Landlord:                                         With a copy to:

_____       _____
_____       _____

Attn: _____       Attn: _____

If to Tenant:

7-Eleven, Inc.
Attn: Corporate Real Estate, Store # _____
3200 Hackberry Road
Irving, Texas 75063

Any notice, request, demand or other communication delivered or sent in the manner aforesaid shall be deemed delivered on the earlier to occur of (i) actual receipt, or (ii) the date of delivery, refusal or non-delivery indicated on the return receipt, if deposited in a United States Postal Service Depository, postage prepaid, sent certified or registered mail, return receipt requested, or if sent via a recognized commercial courier service providing for a receipt, addressed to any party(ies) hereto at the addresses set forth above. Any party may change its address by notifying the other parties of the new address in any manner permitted by this paragraph.

9. **JOINDER OF LANDLORD.** Landlord hereby agrees to the subordination and attornment effected hereunder upon the terms herein stated.

10. SUCCESSORS AND ASSIGNS. This Agreement and each and every covenant, agreement and other provision hereof shall be binding upon and shall inure to the benefit of the parties hereto and their representatives, successors and assigns, as applicable.

11. COUNTERPARTS. This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument, and any person intended to be a signatory hereto may execute this Agreement by signing any such counterpart.

12. GOVERNING LAW. The laws of the state in which the Premises are located shall govern the validity, performance and enforcement of this Agreement. The invalidity or unenforceability of any provision of this Agreement shall not affect or impair any other provision.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the dates set forth in their respective acknowledgments.

*[The remainder of this page is intentionally left blank. The signature pages follow.]*

WITNESS the following signatures and seals.

TENANT:

**7-ELEVEN, INC.,**
a Texas corporation

By: _____
Name: _____
Title: _____

## ACKNOWLEDGEMENT

STATE OF _____ §
§
COUNTY OF _____ §

    BEFORE ME, the undersigned, a Notary Public in and for the State of Texas, on this day personally    appeared _____, an _____ of 7-ELEVEN, INC., known to me to be the person whose name is subscribed to the foregoing instrument, and acknowledged to me that the same was the act of the said corporation and that he/she executed the same as the act of such corporation for the purposes therein expressed and in the capacity therein stated.

    GIVEN UNDER MY HAND AND SEAL OF OFFICE this _____ day of _____, 20____.

_____
(Notary signature)

(seal)

_____
(typed or printed name)

My commission expires: _____

WITNESS the following signatures and seals.

LANDLORD:
PICKERINGTON RETAIL VENTURES, LTD
D.B.A. THE SHOPPES AT HUNTERS RUN

By: _____

Name: Laurence G. Ruben_____

Title: Managing Member

## ACKNOWLEDGEMENT

**STATE OF OHIO**
**COUNTY OF FRANKLIN, SS:**

*This is an acknowledgement certificate; no oath or affirmation was administrated to the signer with regard to this notarial act.*

The foregoing instrument was acknowledged before me this _____ day of May, 2021 by Laurence G. Ruben, Managing Member of Pickerington Retail LTD d.b.a. The Shoppes at Hunters Run, on behalf of the limited liability company, the above-named Landlord.

_____
NOTARY PUBLIC
My commission expires: _____

## EXHIBIT A to FORM OF SNDA

Legal Description of the Premises

# Pickerington Retail Ventures, Ltd.

## v.

## 7-Eleven, Inc.

# EXHIBIT "B"
# NOTICE OF TERMINATION



January 28 2022

**VIA UPS**

Pickerington Retail Ventures, LTD
c/o Plaza Properties, Inc.
3016 Maryland Ave.
Columbus, Ohio 43209
Attn: President

RE: Store 42167 – Shoppes at Hunters Run, 10501 Blacklick-Eastern Road, Suites 100-400 Pickerington, Ohio ("Premises").

Dear Sirs/Madam,

As you are aware, this office represents 7-Eleven Inc. ("Tenant"), in connection with that certain Shopping Center Lease ("Lease") entered into with Pickerington Retail Ventures, LTD, ("Landlord") dated July 28, 2021. As a follow up to Tenant's prior discussions with Landlord, Tenant has elected to terminate the Lease pursuant to Article 22 of the Lease.

I have attached hereto a Lease Termination Agreement ("Agreement") to be signed by Landlord. The Agreement provides, among other things, that Tenant agrees to pay Landlord an early termination fee in the amount of $39,360.00, in consideration of the parties mutual release and termination of the Lease. Please sign the attached Agreement and return to my attention along with wiring instructions.

Very truly yours,

Grant Distel
Sr. Director of Development

cc: **Via UPS**

Pickerington Retail Ventures, LTD
c/o Plaza Properties, Inc.
3016 Maryland Ave,
Columbus, Ohio 43209
Attn: Chairman

7908G352v.1

John I. Cadwallader, Esquire
Frost Brown Todd LLC
One Columbus Center
10 West Broad Street, Suite 2300
Columbus, OH 43215-3484

**Via Email**

Christian Braddock
Jayme Altemus
Kelly Curley
Keneisha Miller, Esq.
Scott Fenton, Esq.

79082052v.1